**BELLSOUTH CORPORATION
and BellSouth Wireless,
Inc., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, and United States of
America, Appellees.**

U S West, Inc. and Rural
Telecommunications
Group, Intervenors.

Nos. 97–1630, 97–1631.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 24, 1998.

Decided Jan. 8, 1999.

L. Andrew Tollin argued the cause for appellants/petitioners. With him on the briefs were Michael Deuel Sullivan, Robert G. Kirk, Craig E. Gilmore, William B. Barfield, M. Robert Sutherland, Jim O. Llewellyn and David G. Frolio.

Jeffrey H. Dygert, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Catherine G. O'Sullivan and Andrea Limmer, Attorneys, Christopher J. Wright, General Counsel, Federal Communications Commission, and Daniel M. Armstrong, Associate General Counsel. John E. Ingle, Deputy Associate General Counsel, and Joel Marcus, Counsel, entered appearances.

Before: EDWARDS, Chief Judge, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

In 1994, the Federal Communications Commission established a 45 MHz spectrum cap on commercial mobile radio services ("CMRS") that limited the total amount of cellular, broadband personal communication service ("PCS"), and specialized mobile radio

("SMR") spectrum that a given entity could accumulate. *See* 9 F.C.C.R. 7988, 7999, para. 16. Because BellSouth[1] had an ownership interest in RAM Mobile Data USA, L.P., a holder of SMR licenses, BellSouth's combined CMRS spectrum holdings prevented it from acquiring two 10 MHz PCS licenses in certain markets without exceeding the cap. *See* Request for Waiver at 1–4. BellSouth requested a waiver of the spectrum cap as well as reconsideration of the rule on the grounds that the cap was designed to ensure competition in voice transmission and should apply only to "covered" SMR spectrum (i.e., SMR spectrum that is interconnected with the public switched network and devoted to real-time, two-way switched voice service). The Commission denied both requests. On appeal, BellSouth contends that the Commission's action was arbitrary because the cap is overbroad and virtually unwaivable. We deny the petition for review and affirm the Commission's denial of the waiver request.

## I.

CMRS encompasses different types of spectrum put to a variety of uses. It includes all mobile services commercially offered to the public that are connected to the telephone network, such as cellular phone service, paging, mobile data, mobile satellite, and other wireless services. *See generally* Second Report & Order, 9 F.C.C.R. 1411, 1422–42, paras. 30–70 (1994). CMRS is composed of cellular, PCS, and SMR spectrum. Within each of these categories, spectrum is described as narrowband (using less than 5 MHz of spectrum) and broadband (using more than 5 MHz of spectrum). The narrowband/broadband distinction rests in part on whether it is possible to accumulate enough spectrum to provide voice communication. Entities can use CMRS spectrum to provide voice-to-voice service, such as cellular phone or dispatch service, as well as data-only service, such as paging.

In 1994, the Commission adopted changes to the technical, operational, and licensing rules "to establish regulatory symmetry among similar mobile services." Third Report & Order, 9 F.C.C.R. 7988, 7992, para. 1 (1994). These changes included imposition of a 45 MHz cap on the total amount of cellular, PCS, and SMR spectrum an entity could have in any geographic area. *Id.* at 7999, para. 16. The Commission justified the cap "as a minimally intrusive means of ensuring that the mobile communications marketplace remains competitive and retains incentives for efficiency and innovation." *Id.* at 8100, para. 238; *see also id.* at 8104, para. 248. The spectrum cap would prevent entities from accumulating spectrum and thereby "precluding entry by other service providers." *Id.* at 8101, para. 240. Rejecting a "case-by-case" approach, the Commission described the cap as a "bright line test" that would provide certainty and ease the Commission's "administrative burden." *Id.* at 8104–05, para. 250.

The changing nature of the market was key to determining the scope of the cap. The Commission first observed that services provided on the CMRS spectrum were converging. *See id.* at 8020, para. 56. The Commission explained that the various mobile services shared the common purpose of servicing customers who "need to communicate electronically on a real-time basis (or virtually real-time basis) while they are 'on the move.'" *Id.* at 8021, para. 58. Technological innovation influenced market trends that would allow various CMRS licensees to compete. The Commission observed that voice communication providers had the capacity to provide data services and that data service providers had the option, with reconfiguration and accumulation of spectrum, to provide voice services. *See id.* at 8026–35, paras. 69–77. The Commission concluded that "trends in the CMRS marketplace ... illustrate a strong potential for further competition among all CMRS services." *Id.* at 8035, para. 77.

In defining the scope of the cap's coverage, the Commission decided to exclude all terrestrial narrowband radio services. *See id.* at 8111, para. 267. Because it was "highly

---

1. BellSouth Corporation petitions for review of the Commission's order enforcing the 45 MHz cap. BellSouth Wireless appeals the Commission's denial of its waiver request. For ease of reference, at times we will refer to them collectively as "BellSouth."

unlikely that one entity could ever accumulate as much as 5 MHz in any given geographic market" and other regulatory safeguards existed, the Commission concluded that "there is little risk that an entity could use narrowband allocations to exert undue market power over CMRS as a whole." *Id.* The Commission also excluded Mobile Satellite Service ("MSS") from the cap, in view of the differences between satellite and terrestrial service, capacity, and spectrum use that "mak[e] it unreasonable to equate relative spectrum usage for purposes of determining a spectrum aggregation limit." *Id.* at 8112, para. 269. By contrast, while acknowledging some merit to the view that SMR spectrum is not currently equivalent to cellular or broadband PCS spectrum, the Commission concluded that SMR would be subject to spectrum aggregation limits. To take account of the unique nature of SMR spectrum, each licensee would be attributed a maximum of 10 MHz of SMR spectrum, regardless of how much spectrum above 10 MHz it actually held, because 10 MHz constituted the largest attainable block of contiguous SMR spectrum. *See id.* at 8113–14, para. 275. The Commission specifically recognized that "small" SMR providers, *i.e.* entities with under 5 MHz of attributable SMR spectrum, would be subject to the cap. It viewed this result as acceptable because these entities were still eligible for up to 40 MHz of broadband PCS spectrum, and able to acquire both a 30 MHz and a 10 MHz PCS license in the same geographic area. *See id.* at 8114, para. 275; 8109, para. 263. The Commission also placed all SMR channels under the cap, and rejected the view that 900 channel SMR should be excluded due to its small spectrum

and narrow channel bandwidth, explaining that "high quality mobile telephone service can be provided on 900 MHz SMR channels and there is the possibility of aggregating up to 5 MHz of spectrum in this band, [so] there seems no compelling reason to exclude those channels." *Id.* at 8116, para. 280.

The Commission reconsidered the cap following a remand from the United States Court of Appeals for the Sixth Circuit, in a case in which the 45 MHz cap itself was not at issue but the attribution and eligibility rules were. *See Cincinnati Bell Tel. Co. v. FCC,* 69 F.3d 752 (6th Cir.1995).[2] In response to the court's holding that the attribution rule was arbitrary because the Commission had failed to present any support for its common sense predictive judgment about market behavior, *see* 69 F.3d at 761, the Commission did two things, *see* Report & Order, 11 F.C.C.R. 7824 (1996). First, it eliminated the spectrum-specific caps,[3] observing that most commentators considered the 45 MHz cap adequate to avoid concentration and entry barriers. *See id.* at 7865, para. 87. Second, it conducted a Herfindahl–Hirschman Index analysis to determine what level of concentration of ownership would result in an undesirable level of competition. *See id.* at 7869–73, paras. 94–102. Concluding that a spectrum cap was needed to avoid "excessive concentration of licenses" and to promote competition in the CMRS marketplace, *id.* at 7869, para. 94, the Commission considered various hypothetical market structures for mobile two-way voice communications service in the same geographic area.[4] It determined that the 45 MHz cap

---

**2.** The attribution rule provided that any entity with a twenty percent ownership interest in an existing cellular provider was deemed to be a cellular provider subject to limits on how much PCS spectrum it could acquire. The cellular eligibility rules limited the amount of PCS spectrum that a cellular licensee could obtain in regions where its cellular and PCS license areas overlapped. The Sixth Circuit held that both rules were arbitrary, concluding that:

> while avoiding excessive concentration of licenses certainly is a permissible goal under the Communications Act, simply precluding a class of potential licensees from obtaining licenses (without a supported economic justification for doing so) solves the problem arbitrarily. The

FCC must supply a reasoned basis for its decision. The need to avoid "excessive concentration of licenses" does not provide the requisite "reasoned basis." Without any economic rationale, the Cellular eligibility rules are nothing more than an arbitrary regulation....

*Cincinnati Bell,* 69 F.3d at 764 (citations omitted).

**3.** The Commission had earlier imposed a cap of 25 MHz on cellular spectrum and a cap of 40 MHz on PCS spectrum. *See* Third Report & Order, 9 F.C.C.R. 7988, 8104 n. 479 (1994).

**4.** For purposes of its HHI analysis, the Commission defined the product market as "mobile two-

would do the trick—guard against high concentration in the market, prevent licensees from gaining too great a competitive advantage over new entrants, and further the goal of diversity. *See id.* at 7873–74, paras. 101–02. The Commission noted that divestiture, *see id.* at 7876, para. 107, and eventually disaggregation and geographic partitioning, *see id.* at 7873, para. 100, would be available to allow an entity to bid on blocks of PCS spectrum as they became available.

Shortly thereafter, BellSouth Wireless requested a waiver of the spectrum aggregation limit.[5] Explaining that RAM Mobile (an entity in which it holds a 49% ownership interest) had a number of 900 MHz SMR licenses, BellSouth pledged that with those licenses RAM provided data-only services and "does not offer now and does not intend in the future to offer real time, two-way switched voice service given the architecture of its network and the telecommunications market segments it has targeted." The spectrum cap would prevent BellSouth from bidding on two 10 MHz packages of PCS spectrum because its .5 MHz (or less) of SMR would take it over the spectrum cap when added to the 25 MHz of cellular spectrum it already held. Consequently, BellSouth proposed that the Commission apply to the spectrum cap the distinction it had recognized in other contexts between "covered" and "non-covered" SMR.[6] BellSouth Corporation, in turn, requested reconsideration of the rule so that it would include only "covered" SMR in the spectrum cap, asserting that this modification would bring the

Commission's spectrum cap policy in line with other decisions in the wireless area.

The FCC's response was two-fold. First, in a letter dated August 29, 1996, the Wireless Telecommunications Bureau denied BellSouth's request for a waiver. *See* Letter re: BellSouth Wireless, Inc. Request for Waiver in Auction No. 11, 11 F.C.C.R. 9970 (1996). The Bureau stated that BellSouth's assertion that RAM does not compete with real-time two-way voice service was based on a misconception about the underlying purpose of the CMRS spectrum cap; the cap in fact arose out of concerns about excessive horizontal concentration and market barriers. *See id.* at 9971. Additionally, while covered versus non-covered SMR was a significant distinction in some contexts, it was not so in the spectrum aggregation context. *See id.* The Bureau also invited BellSouth to seek to divest itself of the .5 MHz of SMR spectrum if it wished to bid for two 10 MHz bundles of PCS or to pursue its argument as part of a request for reconsideration of related orders. *See id.* at 9972.

The Commission affirmed the Bureau's denial of a waiver, rejecting BellSouth's arguments that the rule was in effect unwaivable and that the Bureau had not given a "hard look" at the waiver application. *See* Memorandum Opinion & Order, 12 F.C.C.R. 14031 (1997). The Bureau had considered the facts proffered, balanced them and the purposes underlying the CMRS spectrum aggregation limit, and noted the availability of alternative ways that BellSouth could obtain relief. The Commission also declined to reconsider the

way voice communications service." 11 F.C.C.R. at 7904, App. A. "Competitors" were defined as licensees for cellular service, broadband PCS, and the largest interconnected SMR. *See id.* Market share was measured in terms of "[a]llocated spectrum," which gauges a CMRS carrier's long-term capacity, *id.* at 7870, para. 96, and the "capacity" for a geographic market was represented by licensed spectrum for cellular service (two licenses for 25 MHz), broadband PCS (three licenses for 30 MHz and three licenses for 10 MHz), and the largest potential interconnected SMR provider (holding multiple licenses for a maximum total of 10 MHz), *see id.* at 7870, para. 97. The Commission compared the market concentration that would result with and without the spectrum cap.

**5.** At footnote 18 of its waiver request, BellSouth suggested that the waiver could include the con-

dition that the .5 MHz of spectrum not be used for "real-time, two-way switched voice service."

**6.** In other proceedings, the Commission had defined "covered SMR" as spectrum devoted to licensees that offer real-time, two-way switched voice service that is interconnected with the public switched network. That term did not include "local SMR licensees offering mainly dispatch services to specialized customers in a noncellular system configuration, ... licensees offering only data, one-way, or stored voice services on an interconnected basis" or "any SMR provider that is not interconnected to the public switched network." *Interconnection and Resale Obligations Pertaining to CMRS*, First Report & Order, 11 F.C.C.R. 18455, 18466, para. 19 (1996).

cap, rejecting BellSouth's narrow view of its purpose. The cap, the Commission explained, was designed

> to promote diversity and competition in mobile services, by recognizing the possibility that mobile service licensees might exert undue market power or inhibit market entry by other service providers if permitted to aggregate large amounts of spectrum.... Despite BellSouth's contention to the contrary, the underlying purpose of the spectrum cap was not limited to promoting competition in voice services only.

*Id.* at 14038–39, para. 12. Further, the Commission explained that it distinguished covered and non-covered SMR in rules that only affected two-way voice services interconnected to the public switched network. *See id.* at 14040, para. 14. With regard to spectrum aggregation, the Commission explained that it

> still concludes that SMR technology holds the potential to permit SMR operators to offer services that are nearly identical to those offered by both cellular and broadband PCS providers, and thus that all SMR services regulated as CMRS should be within the cap in order to guard against excessive spectrum aggregation. Further, technological innovation may drive cellular, broadband PCS, and SMR services toward a convergence of similar service offerings designed to respond to consumer demand.

*Id.*

## II.

In its petition and appeal to this court, BellSouth makes two principal contentions: first, that the spectrum cap rule is overbroad, extending beyond its purpose to assure competition in voice communications, and second, that the Commission has adopted a virtually unwaivable rule and failed to give the waiver request a "hard look." Just as narrowband is exempt from the cap, BellSouth contends, SMR dedicated to data-only services should be as well. Essentially, BellSouth maintains that the only purpose of the rule was to prevent the exercise of market power in voice services, not non-voice data-only services. This purpose is clear, BellSouth main-

tains, from the fact that (1) the Commission exempted narrowband spectrum, which is used for non-voice services; (2) in conducting its market analysis following the remand from the Sixth Circuit, the Commission defined the market and other terms such that the only economic justification for the cap is to deter excess spectrum concentration and market power in the voice communication market; and (3) the Commission has repeatedly distinguished between covered SMR (voice services) and non-covered SMR (non-voice services) in regulatory decisions on the ground that the services did not compete in the same market. Finally, BellSouth contends that by failing to identify the standards for evaluating waiver requests, the Commission has engaged in the type of tautological reasoning rejected by this court in *WAIT Radio v. FCC*, 418 F.2d 1153, 1158 (D.C.Cir. 1969)(*WAIT I*). *See* Pet'r's Br. at 19 ("In sum, the [Commission's] failure to cure the overbreadth of its rule, coupled with its unwillingness to entertain a clearly *de minimis* waiver was unreasoned decisionmaking.").

### A.

 Under the Administrative Procedure Act, the court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). Thus, in reviewing decisions of the Commission, the court

> must affirm the decision if we find that it is not contrary to law, that it is supported by substantial evidence and based upon a consideration of the relevant factors, and if we determine that the conclusions reached have a rational connection to the facts found. When, as in this case, an agency is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, our role is more limited; we require only that the agency so state and go on to identify the considerations it found persuasive.

*Melcher v. FCC*, 134 F.3d 1143, 1152 (D.C.Cir.1998) (citations and quotation marks omitted). Although the arbitrary and capricious standard of review is deferential, the court will "intervene to ensure that the agen-

cy has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action. Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we must undo its action." *Petroleum Communications, Inc. v. FCC,* 22 F.3d 1164, 1172 (D.C.Cir.1994) (alteration in original) (citation and quotation marks omitted). However, to the extent that the FCC's decision is based upon a "predictive judgment," the court's review is "particularly deferential." *Melcher,* 134 F.3d at 1151. The Commission is not required "to 'conclusively establish' the factual validity of the agency's premises." *Id.* (quoting *FCC v. National Citizens Comm. for Broad.,* 436 U.S. 775, 796, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978)).

■ Challenging the denial of a waiver is likewise not an easy task because an applicant for waiver bears the heavy burden on appeal to show that "the Commission's reasons for declining to grant the waiver were so insubstantial as to render that denial an abuse of discretion." *Turro v. FCC,* 859 F.2d 1498, 1499 (D.C.Cir.1988); *see also Thomas Radio Co. v. FCC,* 716 F.2d 921, 924 (D.C.Cir.1983).

### B.

■ Central to BellSouth's challenge to the spectrum cap is its view that the cap has one goal: to foster competition in mobile voice-to-voice communication. With this goal as a basis for regulation, BellSouth contends that the FCC irrationally included within the CMRS spectrum cap SMR spectrum dedicated to data services, which, BellSouth maintains, can have no impact on the competitive nature of the voice communication market. Yet the Commission has taken a different position, maintaining that it was concerned with the effect of CMRS spectrum aggregation on the development of market power and on the competitive market for mobile services as a whole in light of the predicted potential for various services along that spectrum to converge. The general cap on CMRS spectrum thus reflects concern for the CMRS market generally. The Commission has predicted that mobile services will converge because of consumer demands and

providers' technological capabilities to offer various voice and data services. Contrary to BellSouth's characterization, which either ignores or discredits other concerns and objectives that resulted in the spectrum cap, the Commission has consistently maintained that general spectrum aggregation will enable an anticompetitive exercise of market power absent a cap on the amount of spectrum one entity can hold. So viewed, BellSouth's contentions about the effects of excluding SMR spectrum used to provide data-only services falter. To exempt SMR spectrum "dedicated" to data-only use, as BellSouth proposes, would not prevent an entity from accumulating spectrum and in the process, would allow that entity to preclude others from obtaining it. The same entity could subsequently decide to use that spectrum to provide voice services, a change over which the Commission has limited control. Further, even the provision of data-only services would have an impact on the market because mobile voice and data services are marketed to the same consumers and, under the Commission's theory, they are converging services.

BellSouth maintains, however, that the economic analysis conducted by the Commission in response to the remand by the Sixth Circuit in *Cincinnati Bell* demonstrates that the Commission is only concerned with the market for voice communication. For purposes of its economic analysis, the Commission defined the product market as "mobile two-way voice communications service," and competitors as "licensees for cellular service and broadband PCS, and the largest interconnected SMR." Report & Order, 11 F.C.C.R. 7824, 7904 (1996). For purposes of its rulemaking, however, the Commission has viewed the market as the CMRS spectrum as a whole, not merely the provision of certain services on that spectrum. It was this construction of the market that controlled when the spectrum cap was first established in the 1994 *Third Report and Order.* While its HHI analysis focused on voice-to-voice communication, thus indicating that voice communication was high on the Commission's list of concerns, there is nothing to suggest that the Commission abandoned its more general concern in responding to the Sixth Circuit's direction for a "reasoned basis" and "an eco-

nomic rationale" for the Commission's attribution and eligibility rules. To the contrary, what BellSouth fails to acknowledge is that the HHI market analysis, although confined to voice communication, takes into account general spectrum aggregation and market concentration concerns underlying the spectrum cap.

Since its *Third Report and Order,* the Commission has focused on the CMRS spectrum as a whole. It has predicted that the services provided on the CMRS spectrum will converge. Those service providers who are not already actual competitors are certainly potential competitors. *See* 9 F.C.C.R. at 8003, para. 27. As a cellular licensee, BellSouth qualifies as a competitor. Once an entity qualifies as a competitor, the Commission is concerned with how much spectrum that entity accumulates. In its view, market power hinges on the amount of spectrum an entity holds. CMRS spectrum is a finite resource and is also exclusive in that whatever one entity holds cannot be held by another. Moreover, all the spectrum included under the cap could potentially be used to provide voice services. It follows that identification of voice communications as the product market would not undermine the force of the Commission's conclusion that a 45 MHz cap is needed to prevent the exercise of market power.

Furthermore, the fact that the Commission has distinguished between voice and data uses of SMR spectrum in other regulatory decisions[7] does not, as BellSouth appears to conclude, necessarily demonstrate that the Commission's refusal to do so with regard to the spectrum cap is arbitrary and capricious. Rather, an examination of these decisions reveals that the Commission made the "covered"/"noncovered" distinction primarily in addressing how a carrier could structure its CMRS services after acquiring the spectrum.

For example, in *CMRS Resale Order,* the Commission decided that only covered SMR providers would be required to comply with the cellular resale obligation, which prohibits cellular carriers from restricting resale of their services. *See* 11 F.C.C.R. at 18,466, para. 19. The Commission concluded that non-covered licensees, who offer narrowband-type services, do not compete substantially with cellular and broadband PCS providers, and wished only to regulate providers with "significant potential to compete directly with cellular and broadband PCS providers in the near term." *Id.* Similarly, in *CMRS Roaming Order,* the Commission extended the manual roaming rule only to "all CMRS licensees competing in the mass market for real-time, two-way voice services" including covered SMR providers. 11 F.C.C.R. at 9470, para. 12. With regard to non-covered licensees, the Commission concluded that because they "do not compete substantially with cellular and broadband PCS providers," these providers would not be covered. *Id.* at 9471, para. 14. In other proceedings, the Commission has continued to recognize the covered/non-covered distinction in determining how carriers can use their spectrum. *See E911 Order,* 11 F.C.C.R. at 18716, para. 81; *Number Portability Order,* 11 F.C.C.R. at 8355, para. 4 & 8433–34, para. 156. Recently the Bureau permitted Motorola to transfer ownership interests in certain telecommunications holdings to the American Mobile Satellite Corporation, *see ARDIS Order* 13 F.C.C.R. at 5193–94, paras. 18–21, and the Commission decided that any CMRS system not offering two-way switched voice service would be exempt from the requirements of number portability, *see Telephone Number Portability,* CC Docket No. 95–116 RM 8535, FCC 98–275 (released Oct. 20, 1998).

The Commission can reasonably and rationally distinguish between regulating spectrum already held and regulating the accumulation of spectrum. As the Commission

---

7. *See Telephone Number Portability,* CC Docket No. 95–116 RM 8535, FCC 98–275 (released Oct. 20, 1998); *In re Application of Motorola,* Memorandum Opinion & Order, 13 F.C.C.R. 5182 (1998) (*ARDIS Order*); *Interconnection and Resale Obligations Pertaining to CMRS,* First Report & Order, 11 F.C.C.R. 18455 (*CMRS Resale Order*) (1996); *Interconnection and Resale Obligations Pertaining to CMRS,* Second Report & Order, 11 F.C.C.R. 9462 (*CMRS Roaming Order*) (1996); *Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems,* Report & Order, 11 F.C.C.R. 18676 (*E911 Order*) (1996); *Telephone Number Portability,* First Report & Order, 11 F.C.C.R. 8352 (1996) (*Number Portability Order*).

notes in its brief, the orders BellSouth cites for the covered/non-covered SMR distinction address the current state of the market, while the spectrum cap is forward looking, designed to prevent the exercise of market power by providers in the future. In addition, covered and non-covered SMR are not necessarily mutually exclusive over time because the distinction is based on the services offered. Presumably, a licensee may choose to offer services that would render it subject to the regulations for covered SMR; thus, a built-in remedy exists for such developments should they occur. By contrast, the acquisition of spectrum must be limited from the outset. Once an entity acquires the spectrum, it can exercise market power and prevent other licensees from acquiring that spectrum. Although BellSouth argues that the covered/noncovered SMR distinction should operate in the spectrum aggregation context just as it does in the spectrum regulation context, BellSouth has identified no parallel built-in remedy whereby an entity can be divested of spectrum if the Commission later discovers that the market is anticompetitive. The practical differences between regulating the use—as opposed to the acquisition—of spectrum can reasonably render the covered/non-covered SMR distinction inapplicable in this context.

Ultimately, BellSouth's contentions fail because of its restricted view of the Commission's goals and purposes that directly contradicts the Commission's analysis. Absent a showing that SMR spectrum dedicated to data is virtually identical to the "narrowband" spectrum excluded from the cap, which BellSouth failed to make in its briefs or at oral argument, BellSouth cannot demonstrate that the Commission acted arbitrarily when it drew the line between SMR and narrowband spectrum and included SMR in the 45 MHz cap. The Commission's reliance on the converging nature of the CMRS market is sufficient to justify its inclusion of all SMR in the spectrum cap. Similarly, its explanation for the exclusion of narrowband PCS from the cap, namely that it is virtually impossible to accumulate sufficient spectrum, is adequate.

## C.

 BellSouth's attack on the denial of its request for a waiver of the spectrum cap fares no better. BellSouth focuses on the fact that granting its waiver would have involved a *de minimis* exception to the cap, and maintains that the RAM spectrum was "incapable" of being used for voice communication.[8] For these reasons it contends that the Commission failed to give the requisite "hard look" at its waiver request and that the Commission has effectively adopted a "no waiver" policy for the spectrum cap. Maintaining further that the Commission failed to articulate the standards it would apply for waivers, BellSouth wants the court to require such articulation. For the following reasons we conclude that BellSouth has failed to show that the Commission's "reasons for declining the waiver were 'so insubstantial as to render that denial an abuse of discretion.'" *Thomas Radio Co. v. FCC*, 716 F.2d 921, 924 (D.C.Cir.1983) (quoting *WAIT Radio v. FCC*, 459 F.2d 1203, 1207 (D.C.Cir.1972) (*WAIT II*)).

 The "hard look" requirement assures that a general rule serving the public interest for a broad range of situations will not be rigidly applied where its application would not be in the public interest as, for example, where an applicant "proposes a new service that will not undermine the policy" served by the rule. *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C.Cir.1969) (*WAIT I*). Therefore, when an agency receives a request for waiver that is "stated with clarity and accompanied by supporting data," such requests "are not subject to perfunctory treatment, but must be given a hard look." *Id.* While an agency must consider the relevant factors, *see KCST-TV, Inc. v. FCC*, 699 F.2d 1185, 1191–92 (D.C.Cir.1983), in explaining the denial of a waiver request, "the agency is not required to author an essay for the disposition of each application. It suffices, in the usual case, that we can discern the why and wherefore." *ICBC Corp. v. FCC*, 716 F.2d 926, 929 (D.C.Cir.1983) (quotations omitted); *see also P&R Temmer v. FCC*, 743 F.2d 918, 932 (D.C.Cir.1984).

---

8. Contrary to BellSouth's contentions, the record does not confirm that SMR "dedicated" to data only use is truly "incapable" of being used for voice-to-voice services.

At the same time, an agency that is required to give a "hard look" at a waiver request is not necessarily required to have an existing waiver policy for all of its rules. The "strict adherence to a general rule may be justified by the gain in certainty and administrative ease, even if it appears to result in some hardship in individual cases." *Turro v. FCC,* 859 F.2d 1498, 1500 (D.C.Cir. 1988); *see also FCC v. WNCN Listeners Guild,* 450 U.S. 582, 601 n. 44, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981); *Thomas Radio,* 716 F.2d at 925 & n. 20. Rigid and consistent adherence to a policy will be upheld if it is valid. *See ICBC,* 716 F.2d at 929.

From the outset, the Commission has characterized the spectrum cap as a "bright line" rule. Third Report & Order, 9 F.C.C.R. 7988, 8104–05, para. 250 (1994). A spectrum cap, unlike many other regulations, might actually require a bright-line rule to be effective. Moreover, refusal to grant a waiver to BellSouth does not necessarily mean that the Commission has created a "no-waiver" policy. The Commission has consistently stated that the *de minimis* nature of the excess above the cap, standing alone, would not justify a waiver. · At oral argument, the Commission explained that, hypothetically, if a market was not adequately served by providers, the Commission would consider permitting a carrier already in the market to accumulate spectrum above the cap if it seemed that no competitor would enter the market and use otherwise fallow spectrum. In other words, even a bright-line rule may give way to spe-

cial circumstances warranting an exception in the public interest. Such circumstances do not arise, however, where, as here, a waiver applicant seeks to circumvent a rule merely because it does so only minimally.[9]

The Commission reasonably determined that the Bureau gave BellSouth's waiver request a "hard look," explaining that the cap was designed to prevent aggregation of spectrum as well as spur competition and that BellSouth had alternative ways to avoid exceeding the cap. Because BellSouth did not explicitly present a *de minimis* argument in its waiver petition, the Bureau had no reason to address this argument in its letter ruling.[10] In any event, as we have explained, the *de minimis* amount of excess above the cap will not suffice to warrant a waiver. BellSouth has never explained how the public interest would be served by granting its waiver request; instead it merely equates its own business interest with the public interest. In the end, BellSouth's waiver request, aside from its *de minimis* nature, is nothing but a further attack on the Commission's decision to include all SMR spectrum within the 45 MHz cap, a decision which we have held to be reasonable.

Accordingly, we deny BellSouth's petition and affirm the Commission's denial of the waiver request.

---

9. To the contrary, BellSouth's situation arguably presents an instance where the cap should apply. BellSouth is a major player in the CMRS market, and the aggregation of CMRS spectrum, regardless of the use to which it is put, allows BellSouth to exercise market power. BellSouth's situation is also far less sympathetic given the alternatives available, including divestiture of the .5 MHz of SMR spectrum, geographic partitioning, and disaggregation of larger spectrum blocks. Insofar as the record shows, BellSouth did not attempt to exercise the divestiture option as the Bureau hinted it could. Nor does BellSouth challenge the Commission's further observations about how it might either acquire 19.5 MHz of disaggregated PCS spectrum in the "after market" or partition its licensing areas.

10. Furthermore, BellSouth's contention that the Wireless Telecommunications Bureau applied the wrong standard of review is of no moment,

given the virtual identity of material provisions of the correct standard. The standard the Bureau should have applied allows the Commission to grant a waiver that is founded upon an appropriate general standard, shows special circumstances warranting a deviation from the general rule, and would serve the public interest. *See WAIT Radio,* 418 F.2d at 1157–59. The standard the Bureau used, which applies only to broadband PCS waivers, explains that a waiver will be granted upon a showing that "the underlying purpose of the rule will not be served, or would be frustrated, by its application in a particular case, and that grant of the waiver is otherwise in the public interest," 47 C.F.R. § 24.819(a)(1)(i), or that "unique facts and circumstances of a particular case render application of the rule inequitable, unduly burdensome or otherwise contrary to the public interest," *id.* § 24.819(a)(1)(ii).