# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued April 15, 2005　　　　　　　Decided June 21, 2005

No. 04-1300

CHAMBER OF COMMERCE OF THE UNITED STATES OF
AMERICA,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

―――――

On Petition for Review of an Order of the
Securities and Exchange Commission

―――――

*Eugene Scalia* argued the cause for petitioner. With him on the briefs were *John F. Olson*, *Douglas R. Cox*, *Cory J. Skolnick*, *Stephen A. Bokat*, and *Robin S. Conrad*.

*Giovanni P. Prezioso*, General Counsel, Securities & Exchange Commission, argued the cause for respondent. With him on the brief were *Meyer Eisenberg*, Deputy General Counsel, *Jacob H. Stillman*, Solicitor, and *John W. Avery*, Special Counsel.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: The Chamber of Commerce of the United States petitions for review of a rule promulgated by the Securities and Exchange Commission under the Investment Company Act of 1940 (ICA), 15 U.S.C. § 80a-1 *et seq*. The challenged provisions of the rule require that, in order to engage in certain transactions otherwise prohibited by the ICA, an investment company – commonly referred to as a mutual fund – must have a board (1) with no less than 75% independent directors and (2) an independent chairman. The Chamber argues the ICA does not give the Commission authority to regulate "corporate governance" and, in any event, the Commission promulgated the rule without adhering to the requirements of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

We hold the Commission did not exceed its statutory authority in adopting the two conditions, and the Commission's rationales for the two conditions satisfy the APA. We agree with the Chamber, however, that the Commission did violate the APA by failing adequately to consider the costs mutual funds would incur in order to comply with the conditions and by failing adequately to consider a proposed alternative to the independent chairman condition. We therefore grant in part the Chamber's petition for review.

## I. Background

A mutual fund, which is "a pool of assets ... belonging to the individual investors holding shares in the fund," *Burks v. Lasker*, 441 U.S. 471, 480 (1979), is operated by an "investment company" the board of directors of which is elected by the shareholders. Although the board is authorized to operate the fund, it typically delegates that management role to an "adviser," which is a separate company that may have interests

other than maximizing the returns to shareholders in the fund. In enacting the ICA, the Congress sought to control "the potential for abuse inherent in the structure of [funds]" arising from the conflict of interests between advisers and shareholders, *id.*; to that end, the ICA prohibits a fund from engaging in certain transactions by which the adviser might gain at the expense of the shareholders. *See generally* 15 U.S.C. § 80a-12(a)-(g). Pursuant to the Commission's long-standing Exemptive Rules, however, a fund that satisfies certain conditions may engage in an otherwise prohibited transaction. *See, e.g.*, Rule 10f-3, 17 C.F.R. § 270.10f-3 (2004) (when conditions are satisfied, fund may purchase securities in primary offering although adviser-affiliated broker-dealer is member of underwriting syndicate).

Early in 2004 the Commission proposed to amend ten Exemptive Rules by imposing five new or amended conditions upon any fund wishing to engage in an otherwise prohibited transaction. *See* Investment Company Governance, Proposed Rule, 69 Fed. Reg. 3472 (Jan. 23, 2004). Although the Commission had amended the same ten rules in 2001 to condition exemption upon the fund having a board with a majority of independent directors (that is, directors who are not "interested persons" as defined in § 2(a)(19) of the ICA), *see* Role of Independent Directors of Investment Companies, Final Rule, 66 Fed. Reg. 3734 (Jan. 16, 2001), by 2004 the Commission had come to believe that more was required. "[E]nforcement actions involving late trading, inappropriate market timing activities and misuse of nonpublic information about fund portfolios" had brought to light, in the Commission's view, "a serious breakdown in management controls," signaling the need to "revisit the governance of funds." 69 Fed. Reg. at 3472. Accordingly, the Commission proposed to condition the ten exemptions upon, among other things, the fund having a board of directors (1) with at least 75% independent directors

and (2) an independent chairman.  *Id.* at 3474.

After a period for comment and a public meeting, the Commission unanimously adopted three of the proposed new conditions and, by a vote of three to two, adopted the two corporate governance conditions challenged here.  *See* Investment Company Governance, Final Rule, 69 Fed. Reg. 46,378 (Aug. 2, 2004).  The Commission majority adopted those two conditions in light of recently revealed abuses in the mutual fund industry, reasoning that the Exemptive Rules

> rely on the independent judgment and scrutiny of directors, including independent directors, in overseeing activities that are beneficial to funds and fund shareholders but that involve inherent conflicts of interest between the funds and their managers.  ...  These further amendments provide for greater fund board independence and are designed to enhance the ability of fund boards to perform their important responsibilities under each of the rules.

*Id.* at 46,379.  Raising the percentage of independent directors from 50% to 75%, the Commission anticipated, would "strengthen the independent directors' control of the fund board and its agenda," *id.* at 46,381, and "help ensure that independent directors carry out their fiduciary responsibilities," *id.* at 46,382. The Commission justified the independent chairman condition on the ground that "a fund board is in a better position to protect the interests of the fund, and to fulfill the board's obligations under the Act and the Exemptive Rules, when its chairman does not have the conflicts of interest inherent in the role of an executive of the fund adviser."  *Id.*

The dissenting Commissioners were concerned the two disputed conditions would come at "a substantial cost to fund shareholders," and they believed the existing statutory and

regulatory controls ensured adequate oversight by independent directors. 69 Fed. Reg. at 46,390. Specifically, they faulted the Commission for not giving "any real consideration to the costs" of the 75% condition, *id.* at 46,390-46,391; for failing adequately to justify the independent chairman condition, *id.* at 46,391-46,392; and for not considering alternatives to that condition, *id.* at 46,392-46,393. The Chamber timely petitioned for review, asserting an interest in the new conditions both as an investor and as an association with mutual fund advisers among its members.

## II. Analysis

The Chamber makes two arguments on the merits: The Commission had no authority under the ICA to adopt the two conditions; and the Commission violated the APA in the rulemaking by which it promulgated the conditions. Before addressing those arguments, we must assure ourselves of the Chamber's standing, and thus of our jurisdiction.

A. Jurisdiction of the Court

Under Article III of the Constitution the "judicial Power of the United States" is limited to the resolution of "Cases" or "Controversies," a corollary of which is that a party invoking our jurisdiction "must show that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress." *Elk Grove Unified School Dist. v. Newdow*, 124 S.Ct. 2301, 2308 (2004). In this case the Chamber claims it is injured by the two challenged conditions because it would like to invest in shares of funds that may engage in transactions regulated by the Exemptive Rules but do not meet those conditions. *See* Dec'l of Stan M. Harrell ¶ 2 (Chamber currently invests in funds, intends to continue doing so, and would like to invest in funds unconstrained by the

conditions).

The Chamber cites two cases for the proposition that loss of the opportunity to purchase a desired product is a legally cognizable injury. *Consumer Fed'n of Am.* v. *FCC*, 348 F.3d 1009, 1011-12 (D.C. Cir. 2003) (injury-in-fact where merger would deprive plaintiff of opportunity to purchase desired service); *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 112-13 (D.C. Cir. 1990) (injury-in-fact where fuel economy regulations foreclosed "opportunity to buy larger passenger vehicles"). The Commission argues in response that there is no evidence a fund of the type in which the Chamber wants to invest would perform better than a fund that conforms to the two corporate governance conditions. In *Consumer Federation*, however, we held "the inability of consumers to buy a desired product ... constitute[d] injury-in-fact even if they could ameliorate the injury by purchasing some alternative product." 348 F.3d at 1012. Under our precedent, therefore, the Chamber has suffered an injury-in-fact and, because a favorable ruling would redress that injury, it has standing to sue the Commission. And so to the merits.

B.   The Commission's Authority under the ICA

The Chamber maintains the Commission did not have authority under the ICA to condition the exemptive transactions as it did. First the Chamber observes rather generally that "matters of corporate governance are traditionally relegated to state law"; and second, it maintains these particular conditions are inconsistent with the statutory requirement that 40% of the directors on the board of an investment company be independent, *see* 15 U.S.C. § 80a-10(a). The Commission points to § 6(c) of the ICA, 15 U.S.C. § 80a-6(c), as the source

of its authority.[*] That provision conspicuously confers upon the Commission broad authority to exempt transactions from rules promulgated under the ICA, subject only to the public interest and the purposes of the ICA.

The thrust of the Chamber's first contention is that § 6(c) should not be read to enable the Commission to leverage the exemptive authority it clearly does have so as to regulate a matter, namely, corporate governance, over which the states, not the Commission, have authority. For support the Chamber relies principally upon two cases from this circuit concerning the Commission's authority under the Securities and Exchange Act of 1934. Neither of those cases, however, arose from an exercise of authority analogous to the rulemaking here under review.

In *Business Roundtable v. SEC*, 905 F.2d 406, 416-17 (1990), we held the Commission did not have authority under the 1934 Act to bar a stock exchange from listing common stock with restricted voting rights. The Commission had invoked the provision of that Act authorizing it to make rules "otherwise in furtherance of the purposes" of the Act. *Id.* at 410. Reasoning that "unless the legislative purpose is defined by reference to the

---

* That section provides:

> The Commission, by rules and regulations upon its own motion, or by order upon application, may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this [Act] or of any rule or regulation thereunder, if and to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of this [Act].

*means* Congress selected, it can be framed at *any* level of generality," and the means the Congress selected in the 1934 Act was disclosure, *id.*, we vacated the rule because it went beyond disclosure to regulate "the substance of what the shareholders may enact," *id.* at 411.

*Business Roundtable* is of little help to the Chamber because, as the Commission documents, the purposes of the ICA include tempering the conflicts of interest "inherent in the structure of investment companies," *Burks*, 441 U.S. at 480; *see also* 15 U.S.C. § 80a-1(b) ("policy and purposes of [ICA] ... shall be interpreted ... to eliminate" conflicts of interest); and regulation of the governance structure of investment companies is among the means the Congress used to effect that purpose. *See Burks*, 441 U.S. at 479 (ICA "functions primarily to impose controls and restrictions on the internal management of investment companies") (emphases removed); *id.* at 484 (in enacting ICA Congress "place[d] the unaffiliated directors in the role of independent watchdogs ... who would furnish an independent check upon the management of investment companies"). Moreover, the Commission's effort to enlarge the role of independent directors on the boards of investment companies accords with "the structure and purpose of the ICA [both of which] indicate that Congress entrusted to the independent directors ... the primary responsibility for looking after the interests of the funds' shareholders." *Id.* at 484-85.

In *Teicher v. SEC*, 177 F.3d 1016, 1019-20 (1999), we held a provision of the 1934 Act authorizing the Commission to "place limitations on the activities or functions" of a person convicted of securities fraud in the broker-dealer industry did not authorize it to place limitations upon the activities or functions of that person in an industry regulated under a different "occupational licensing regime" administered by the Commission. The Commission's authority, we reasoned, must

be read with "some concept of the relevant domain" in mind; even the Commission did not "suggest that [provision] allows it to bar one of the offending parties from being a retail shoe salesman, or to exclude him from the Borough of Manhattan." *Id*. at 1019. The present case is different from *Teicher* because here the Commission did not exercise its regulatory authority to effect a purpose beyond that of the statute from which its authority derives.

The Chamber's second contention is that the conditions conflict with the intent of the Congress, expressed in § 10(a) of the ICA, that 40% of the directors of an investment company be independent. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"). Section 10(a), however, states only that a fund may have "no more than" 60% inside directors, 15 U.S.C. § 80a-10(a), which necessarily means at least 40% must be independent and strongly implies a greater percentage may be; it speaks not at all to authority of the Commission to provide an incentive for investment companies to enhance the role of independent directors and, as the Commission is keen to point out, the challenged conditions apply only to funds that engage in exemptive transactions.

C.   The Requirements of the APA

The condemnation of the APA extends to any rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Although the "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency," we must nonetheless be sure the Commission has "examine[d] the relevant data and articulate[d] a satisfactory

explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 27, 43 (1983); *see also Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

The Chamber argues the Commission violated the APA because it (1) failed to show the connection between the abuses that prompted the rulemaking and the conditions newly included in the Exemptive Rules; (2) did not comply with its obligation under the ICA to consider whether those conditions "will promote efficiency, competition, and capital formation," 15 U.S.C. § 80a-2(c); *see Pub. Citizen*, 374 F.3d at 1216 (rule is "arbitrary and capricious" if agency fails to consider factors "it must consider under its organic statute"); and (3) did not consider reasonable alternatives to the independent chairman condition.

1.  Justification for the Rulemaking

The Chamber maintains the "rulemaking is flawed for the elementary reason that the Commission amended ten separate and distinct pre-existing rules [by imposing the two challenged conditions] without any meaningful consideration of them." Similarly, the Chamber argues the Commission did not adequately explain why the conditions it added were necessary in light of the conditions previously contained in the Exemptive Rules. The Commission answers that its stated justification for amending the Exemptive Rules satisfies the standards of the APA. We agree.

In the wake of recent revelations of certain abuses in the mutual fund industry, the Commission was concerned about what it diagnosed as "a serious breakdown in management controls." *See* 69 Fed. Reg. at 46,378-46,379; 69 Fed. Reg. at

3472. Although it is true, as the Chamber repeatedly notes, that none of the documented abuses involved a transaction covered by the Exemptive Rules, the Commission, as we have said, thought it prudent to amend those rules because the particular abuses that had come to light revealed a more general problem with conflicts of interest than it had previously suspected and portended further abuses if that perceived problem was not addressed. The Commission thus viewed strengthening the role of independent directors in relation to exemptive transactions as a prophylactic measure, not a response to a present problem involving abuse of the Exemptive Rules. *See* 69 Fed. Reg. at 46,379.

The Chamber claims the Commission's decision was unreasonable because the conditions for engaging in exemptive transactions had already been tightened in 2001. But that begs the question whether the conditions of 2001 were adequate in view of the new evidence that some boards were failing to prevent egregious conflicts of interest involving late trading and market timing. Might not they also fail to police sufficiently the conflicts of interest inherent in the exemptive transactions? That those transactions were already subject to some regulation does not render unreasonable the Commission's judgment that additional regulation was called for as a prophylactic.

Finally, the Chamber argues the "actual terms" of the conditions were not reasonable in light of "the problems [the Commission] claimed justified the rulemaking." Those problems all trace to the failure of investment company boards, for whatever reason, to guard against advisers' conflicts of interest. *See* 69 Fed. Reg. at 3473 ("boards may have simply abdicated their responsibilities, or failed to ask the tough questions of advisers; in other cases, boards may have lacked the information or organizational structure necessary to play their proper role"). So that boards are apprised of the activities of

their fund's adviser, the Commission, in a separate proceeding first required funds to designate a chief compliance officer charged with bringing relevant information to the board. *See* Compliance Programs of Investment Companies and Investment Advisers, 68 Fed. Reg. 74,714 (Dec. 24, 2003). The Commission then undertook in the present rulemaking to ensure that independent directors would be in a position to put such information to good use.

To that end, the Commission reasonably concluded that raising the minimum percentage of independent directors from 50% to 75% would "strengthen the hand of the independent directors when dealing with fund management, and may assure that independent directors maintain control of the board and its agenda." 69 Fed. Reg. at 46,382. Similarly, the Commission concluded that having an independent chairman would be beneficial because the chairman plays "an important role in setting the agenda of the board[,] ... in providing a check on the adviser, in negotiating the best deal for shareholders when considering the advisory contract, and in providing leadership to the board that focuses on the long-term interests of investors." 69 Fed. Reg. at 46,383. We have no basis upon which to second-guess that judgment.

In sum, the Chamber points to nothing in the ICA to suggest the Congress restricted the authority of the Commission to make "precautionary or prophylactic responses to perceived risks," *Certified Color Mfrs. Ass'n v. Mathews*, 543 F.2d 284, 296 (D.C. Cir. 1976); and the Commission's effort to prevent future abuses of exemptive transactions was not arbitrary, capricious, or in any way an abuse of its discretion, in violation of the APA.

2. Consideration of Costs

The ICA mandates that when the Commission "engage[s]

in rulemaking and is required to consider or determine whether an action is consistent with the public interest [it] shall ... consider ... whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. § 80a-2(c). The Chamber argues the Commission violated this mandate, and hence the APA, by failing (1) to develop new, and to consider extant, empirical data comparing the performance of funds respectively led by inside and by independent chairmen; and (2) to consider the costs of the conditions it was imposing, which costs in turn impede efficiency, competition, and capital formation. The Commission denies the charges.

The particulars of the Chamber's first contention are that the Commission should have directed its staff to do a study of the effect of an independent chairman upon fund performance and that when such a study, commissioned by Fidelity Investments, was presented during the comment period, the Commission gave it short shrift. 69 Fed. Reg. at 46,383 n.52; *see* Geoffrey H. Bobroff and Thomas H. Mack, Assessing the Significance of Mutual Fund Board Independent Chairs (Mar. 10, 2004). As to the former point, although we recognize that an agency acting upon the basis of empirical data may more readily be able to show it has satisfied its obligations under the APA, *see Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1096, 1124 (D.C. Cir. 1984) (in informal rulemaking it is "desirable" that agency "independently amass [and] verify the accuracy of" data), we are acutely aware that an agency need not – indeed cannot – base its every action upon empirical data; depending upon the nature of the problem, an agency may be "entitled to conduct ... a general analysis based on informed conjecture." *Melcher v. FCC*, 134 F.3d 1143, 1158 (D.C. Cir. 1998); *Nat'l Ass'n of Regulatory Util. Comm'rs*, 737 F.2d at 1124 (failure to conduct independent study not violative of APA because notice and comment procedures "permit parties to bring relevant information quickly to the agency's attention"); *see also*

14

*FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813-14 (1978) (FCC, in making "judgmental or predictive" factual determinations, did not need "complete factual support" because "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency").

Here the Commission, based upon "its own and its staff's experience, the many comments received, and other evidence, in addition to the limited and conflicting empirical evidence," concluded an independent chairman "can provide benefits and serve other purposes apart from achieving high performance of the fund." 69 Fed. Reg. at 46,383-46,384. The Commission's decision not to do an empirical study does not make that an unreasoned decision. *See BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221 (D.C. Cir. 1999) ("When ... an agency is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, our role is more limited; we require only that the agency so state and go on to identify the considerations it found persuasive").

Nor did the Commission violate the APA in its consideration of the Fidelity study. Although Chairman Donaldson did, as the Chamber points out, betray a dismissive attitude toward the value of empirical data, SEC Open Meeting, 57-58 (June 23, 2004) ("there are no empirical studies that are worth much. You can do anything you want with numbers and we've seen evidence of that in a number of our submissions"), the Commission did not reject the Fidelity study or decline to do its own study upon that basis. Rather, the Commission concluded the Fidelity study was "unpersuasive" because, as the authors acknowledged, it did not rule out "other important differences [than independence of the chairman] that may have impacted performance results," 69 Fed. Reg. at 46,383 n.52 (quoting study), and because it did not use a reliable method of calculating fund expenses, *id*. The Commission also noted that

other commenters reviewing the Fidelity study had concluded funds with an independent chairman did "slightly better in terms of returns, but at lower cost." *Id.* Although a more detailed discussion of the study might have been useful, the Commission made clear enough the limitations of the study, and we have no cause to disturb its ultimate judgment that the study was "unpersuasive evidence." *Cf. Hüls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996) (court owes "extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise").*

We reach a different conclusion with regard to the Commission's consideration of the costs of the conditions. With respect to the 75% independent director condition, the Commission, although describing three methods by which a fund might comply with the condition, claimed it was without a "reliable basis for determining how funds would choose to satisfy the [condition] and therefore it [was] difficult to determine the costs associated with electing independent directors." 69 Fed. Reg. at 46,387. That particular difficulty may mean the Commission can determine only the range within which a fund's cost of compliance will fall, depending upon how it responds to the condition but, as the Chamber contends, it does not excuse the Commission from its statutory obligation to determine as best it can the economic implications of the rule

---

\* The Chamber also argues the Congress's subsequent direction to the Commission to "provide[] a justification" for the independent chairman condition, *see* Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809 (2004), establishes that the Commission failed to provide an adequate justification in the rulemaking proceeding. That does not follow, however; the Congress may require a more detailed explanation for a rule than is required by the APA. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 44-45 (rejecting view "congressional reaction" to rule necessitated stricter judicial review).

it has proposed. *See Pub. Citizen*, 374 F.3d at 1221 (in face of uncertainty, agency must "exercise its expertise to make tough choices about which of the competing estimates is most plausible, and to hazard a guess as to which is correct, even if ... the estimate will be imprecise").

With respect to the costs of the independent chairman condition, counsel maintains the Commission "was not aware of any costs associated with the hiring of staff because boards typically have this authority under state law, and the rule would not require them to hire employees." The Commission made that observation, however, in regard not to the independent chairman condition but to a condition not challenged here, and we cannot therefore consider counsel's rationalization for the regulation under review. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50 ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action"). In any event, the argument is a *non sequitur*; whether a board is authorized by law to hire additional staff in no way bears upon the contention that, because of his comparative lack of knowledge about the fund, an independent chairman would in fact cause the fund to incur additional staffing costs.

What the Commission itself did was acknowledge in a footnote that an independent chairman "may choose to hire [more] staff" but it stopped there because, it said, it had no "reliable basis for estimating those costs." 69 Fed. Reg. at 46,387 n.81. Although the Commission may not have been able to estimate the aggregate cost to the mutual fund industry of additional staff because it did not know what percentage of funds with independent chairman would incur that cost, it readily could have estimated the cost to an individual fund, which estimate would be pertinent to its assessment of the effect the condition would have upon efficiency and competition, if not upon capital formation. And, as we have just seen, uncertainty may limit what the Commission can do, but it does not excuse

the Commission from its statutory obligation to do what it can to apprise itself – and hence the public and the Congress – of the economic consequences of a proposed regulation before it decides whether to adopt the measure.

In sum, the Commission violated its obligation under 15 U.S.C. § 80a-2(c), and therefore the APA, in failing adequately to consider the costs imposed upon funds by the two challenged conditions.

3. Consideration of Alternatives

Finally, the Chamber argues the Commission gave "inadequate consideration" to suggested alternatives to the independent chairman condition, citing as an example – the only significant one, it seems to us – the proposal, endorsed by the two dissenting Commissioners, that each fund be required prominently to disclose whether it has an inside or an independent chairman and thereby allow investors to make an informed choice. Commission counsel responds by noting generally that the agency is "not required to discuss every alternative raised" and that it did consider the "major alternatives" proposed by commenters, adding more specifically that it had no obligation to consider the dissenters' disclosure alternative because the "Congress rejected a purely disclosure-based approach to regulating conflicts of interest under the [ICA]."

We conclude the Commission's failure to consider the disclosure alternative violated the APA. To be sure, the Commission is not required to consider "every alternative ... conceivable by the mind of man ... regardless of how uncommon or unknown that alternative" may be. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 51. Here, however, two dissenting Commissioners raised, as an alternative to prescription, reliance upon disclosure, *see* 69 Fed. Reg. at 46,393 – a familiar tool in

the Commission's toolkit – and several commenters suggested that the Commission should leave the choice of chairman to market forces, making it hard to see how that particular policy alternative was either "uncommon or unknown."

The Commission would nevertheless be excused for failing to consider this alternative if it were, for whatever reason, unworthy of consideration. Commission counsel accordingly suggests one such reason, namely, that in the ICA the Congress rejected a "purely disclosure-based approach." *See also SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 78 (1959) (ICA "passes beyond a simple 'disclosure' philosophy"). Counsel's statement is true but irrelevant; that the Congress required more than disclosure with respect to some matters governed by the ICA does not mean it deemed disclosure insufficient with respect to all such matters. On the contrary, the ICA requires funds to make extensive disclosures. *See, e.g.*, 15 U.S.C. § 80a-8(b) (fund must file registration statement with Commission); *id.* § 80a-29(e) (fund must send semiannual report to shareholders); *id.* § 80a-44(a) (fund must make available to public all documents filed with Commission); *see also* Mary M. Frank et al., *Copycat Funds: Information Disclosure Regulation and the Returns to Active Fund Management in the Mutual Fund Industry*, 47 J.L. & Econ. 515 (2004) ("[ICA] regulates information disclosure by mutual funds"). Indeed, the Commission augmented the disclosure requirements of the ICA even as it was considering the independent chairman condition. *See* Final Rule, Shareholder Reports and Quarterly Portfolio Disclosure of Registered Management Investment Companies, 69 Fed. Reg. 11,244, 11,245 (Mar. 9, 2004).

In sum, the disclosure alternative was neither frivolous nor out of bounds and the Commission therefore had an obligation to consider it. *Cf. Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1498 (D.C. Cir. 1989) ("where a party raises facially reasonable alternatives ... the agency must either consider those alternatives

or give some reason ... for declining to do so") (emphases removed). The Commission may ultimately decide the disclosure alternative will not sufficiently serve the interests of shareholders, but the Commission – not its counsel and not this court – is charged by the Congress with bringing its expertise and its best judgment to bear upon that issue. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 54.

## III. Conclusion

For the foregoing reasons, we grant in part the Chamber's petition for review. This matter is remanded to the Commission to address the deficiencies with the 75% independent director condition and the independent chairman condition identified herein. *See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048-49 (D.C. Cir. 2002); *Allied Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

*So ordered*.