197 F.3d 512 (D.C. Cir. 1999)
 Mountain Solutions, Ltd., Inc.,Appellant
v.
Federal Communications Commission, Appellee
 No. 98-1503
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued October 12, 1999
Decided December 3, 1999
 
 Appeal of an Order of the Federal Communications Commission
 Michael K. Kurtis was on the briefs for appellant.
 Christopher J. Wright, General Counsel, Federal Communications Commission, Daniel M. Armstrong, Associate General Counsel, and Pamela L. Smith, Counsel, were on the brief for appellee.
 Before: Ginsburg, Rogers and Tatel, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Rogers.
 Rogers, Circuit Judge:
 
 
 1
 Mountain Solutions Ltd., Inc. was the winning bidder for ten licenses in the broadband personal communications service C block auction. Under the rules of the Federal Communications Commission, Mountain Solutions was required to make a 10% down payment for the licenses, payable in two installments. See 47 C.F.R. §§ 24.711(a)(2), 24.809(b). Mountain Solutions paid the first installment but was unable to make timely payment of the second down payment. On the due date, Mountain Solutions petitioned the Commission for a thirty-day waiver of its rules in order to allow completion of financing discussions. Although Mountain Solutions supplemented its waiver request within twenty-three days to state that financing discussions had been successfully concluded and then, following the Commission's grant of other waivers, tendered an irrevocable letter of credit, the Commission denied the waiver request for lack of financing on the due date. On appeal Mountain Solutions contends that the Commission was arbitrary and capricious in denying a waiver when it granted waivers to similarly situated entities, and that changed regulatory procedures make recission an appropriate remedy for such arbitrary and capricious action. Alternatively, Mountain Solutions asks the court to enjoin the Commission's enforcement of any default penalties against it. Because the Commission did not abuse its broad discretion in denying a waiver and because the claim for injunctive relief is not ripe, we deny the petition in part and dismiss the petition in part.
 
 I.
 
 2
 In 1993, Congress authorized the Federal Communications Commission ("Commission") to allocate radio spectrum by auction. See Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, tit. VI, 6002(a), 107 Stat. 312, 387-392 (1993) codified in principal part at 47 U.S.C. 309(j). Congress directed the Commission to design its implementing rules to "ensure that smaller businesses ... and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum based services," and thus "to consider the use of ... [such procedures as] bidding preferences...." 47 U.S.C. 309(j)(4)(D). Accordingly, the Commission set aside two blocks of personal communications service ("PCS") spectrum, the 30 MHz C block and the 10 MHz F block, for bidding by "designated entities," defined as "small businesses, businesses owned by members of minority groups and/or women, and rural telephone companies." 47 C.F.R. 1.2110(a) (1999);see also Implementation of Section 309(j) of the Communications Act--Competitive Bidding, Fifth Report and Order, 9 F.C.C.R. 5532 p p 93-95, 113 (1994). In recognition of the challenges faced by designated entities in obtaining financing, the Commission adopted a special payment program for C block licenses, reducing both the up front bid amount and the percentage down payment at the close of the auction. Thus, the licensees were required to submit a 5% down payment within five days of the close of the auction and a second 5% down payment within five days of the conditional grant of their licenses, with the remaining 90% and interest payable in quarterly installments over ten years. See 47 C.F.R. 24.711(a)(1), (2), (b) (1996).
 
 
 3
 Mountain Solutions was the successful bidder for ten licenses in the Commission's original C block auction held from December 1995 through May 1996. It timely paid approximately $1.2 million as its initial 5% down payment. Its license applications were conditionally granted on September 17, 1996, and thus its second down payment was due on September 24th. On the due date, Mountain Solutions filed an emergency petition for a waiver, seeking a thirty-day extension of the second down payment deadline. Asserting that an agreement providing the necessary financing was imminent and was expected within the following thirty days, Mountain Solutions stated that it was negotiating an agreement with a major United States financier to obtain the financing required to meet its obligations but was not yet in possession of the funds. On October 17, 1996, Mountain Solutions supplemented its waiver petition to advise that it had secured the necessary financing from its current investors, while noting that a public notice released August 28, 1996, which gave guidance to D, E, and F Block bidders on the Commission's anti-collusion rule, had contributed to "Mountain Solutions' inability to remit its second down payment within the prescribed time period."[1]
 
 
 4
 Mountain Solutions was one of seventeen applicants for various spectrum licenses seeking a waiver of the down payment deadlines, including seven other C block applicants. The Wireless Telecommunications Bureau ("the Bureau") and the Mass Media Bureau issued a Public Notice seeking comment on how it should evaluate these waiver requests. On February 4, 1997, the Bureau granted other waiver requests, subject to a 5% late penalty, of the other C block applicants as well as other waiver petitions. In each order granting a partial waiver, the Bureau noted that the failure to pay timely was inadvertent. In a number of cases, the inadvertence occurred because the first down payment was sufficient to cover both the first and second down payments, and the bidder had assumed that the Commission retained sufficient funds to cover the latter.[2] Two other bidders had miscalculated the amount of their down payments.[3] The remaining partial waivers were granted in circumstances where the bidder was either unaware of the payment deadline[4] or, due to payment submission complications, made payment one day late.[5] In each order, the Bureau made note of two circumstances: first, the importance the Commission attached to the first and second down payment obligations for "discouraging insincere or financially unqualified bidders from 'shopping' a winning bid in order to obtain financing for a down payment,"[6] and second, that the inadvertent nature of the missed second payment deadline, combined with the fact that payment was submitted promptly upon discovery of the mistake in each case, demonstrated "that, but for the [inadvertent error, each bidder] would have been able to meet its payment obligations on time."[7]
 
 
 5
 On February 12, 1997, Mountain Solutions filed a second supplement to its waiver request, asserting that the Bureau had indicated for the first time in its February 4th waiver orders that it places positive weight on an applicants' late tendered second down payment in determining whether to grant a waiver request, and negative weight on an applicants' apparent inability to pay its second down payment on the due date. In light of the former, Mountain Solutions tendered an irrevocable letter of credit demonstrating that it could meet its second down payment obligation. As to the latter, Mountain Solutions asserted that "the Commission has never suggested [previously] that fundraising efforts to satisfy the second down payment are an indication of 'insincerity' or lack of financial qualifications."
 
 
 6
 On April 28, 1997, the Bureau denied Mountain Solutions' waiver request on the ground that "[t]he failure to secure financing does not serve as a justification for a waiver," and observed:
 
 
 7
 [W]e have not granted a request for an extension of adown payment deadline for a license won through com-petitive bidding in any case where it appeared that theparty requesting the extension did not have the funds onhand on the date of the payment deadline. We havegranted partial relief to licensees only where a delay inmaking payment on the payment due date and the failureto make payment was either inadvertent or due to mis-calculation or administrative complications. MountainSolutions' failure to make its payment resulted from alack of funds, not miscalculation, inadvertence, or admin-istrative complications.
 
 
 8
 In the Matter of Mountain Solutions Ltd., Inc. Request for Waiver of Section 24.711(a)(2) of the Comm'n's Rules, 12 F.C.C.R. 5904 p p 6-7 (1997). Mountain Solutions unsuccessfully sought review by the Commission, which noted that "[o]ur second down payment deadline is critical to our licensing process," and that "Mountain Solutions has failed to demonstrate its financial viability at the time its second down payment was due." In the Matter of Mountain Solutions Ltd., Inc. Emergency Petition for Waiver of Section 24.711(a)(2) of the Comm'n's Rules, 13 F.C.C.R. 21983, p p 14-15, 17 (1998) ("Commission Order"). By contrast, the Commission noted, "[i]n other instances where we have partially granted a payment deadline waiver request, the petitioner receiving relief had the money at the time it was due."Id. at p 16.
 
 II.
 
 9
 Contending that the Commission was arbitrary and capricious in denying its waiver request, Mountain Solutions maintains that (1) all other "similarly situated" parties were granted waivers, making the Commission's treatment of similarly situated parties inconsistent, and undermining the supposed policy basis behind the Commission's treatment of Mountain Solutions; (2) the Commission's revision of its second down payment rule during the pendency of Mountain Solutions' waiver request to make the deadline more flexible indicates that denial of Mountain Solutions' waiver request was unnecessarily harsh and the purported policy basis behind this refusal disingenuous; and (3) the unique circumstances of Mountain Solutions' case renders strict application of the second down payment rule inequitable and contrary to the public interest.
 
 According to the Commission's rule:
 
 10
 Waivers will not be granted except upon an affirmative showing:
 
 
 11
 (i) That the underlying purpose of the rule will not be served, or would befrustrated, by its application in a particular case, and that grant of the waiver is other wise in the public interest; or
 
 
 12
 (ii) That the unique facts and circumstances of a particular case render application of the rule inequitable, unduly burdensome or otherwise contrary to the public interest. Applicants must also show the lack of a reason-able alternative.
 
 
 13
 47 C.F.R. 24.819(a)(1)(i), (ii) (1996).[8] Under the Administrative Procedure Act, the court must " 'hold unlawful and set aside agency action' that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " BellSouth Corp. v. F.C.C., 162 F.3d 1215, 1221 (D.C. Cir. 1999) (quoting 5 U.S.C. 706(2)(A)). As to waiver of agency rules, however, the agency's strict construction of a general rule in the face of waiver requests is insufficient evidence of an abuse of discretion. See, e.g., BellSouth, 162 F.3d at 1225. Instead, "an agency's refusal to grant a waiver will not be overturned unless the agency's reasons are 'so insubstantial as to render that denial an abuse of discretion.' " Green Country Mobile phone, Inc. v. F.C.C., 765 F.2d 235, 238 (D.C. Cir. 1985) (quoting Thomas Radio Co. v. F.C.C., 716 F.2d 921, 924 (D.C. Cir. 1983)). "[T]his burden is a heavy one ..." but "it is carried when an agency arbitrarily waives a deadline in one case but not in another." Id. (citing WAIT Radio v. F.C.C., 459 F.2d 1203, 1207 (D.C. Cir. 1969)); see also BellSouth, 162 F.3d at 1222. Mountain Solutions contends it has met this burden, focusing primarily upon the fact that, of the high bidders in the original C block auction which requested waiver of the second down payment deadline, only it was denied a waiver.
 
 
 14
 Mountain Solutions' contention that it was treated arbitrarily and capriciously is unpersuasive. Of the bidders granted partial waivers, only Mountain Solutions (by its own admission) lacked funds to make the second down payment on the due date (or one day later). Indeed, when the Bureau was initially confronted with a similar circumstance by Carolina PCS I Limited Partnership, the Bureau denied its waiver request. The Bureau reversed itself only after Carolina had submitted affidavits indicating that it had a firm financial commitment from its lending institution equal to the amount of its second down payment on or about the due date.[9] See In the Matter of Carolina PCS I Ltd. Partnership Request for Waiver of Section 24.711(a)(2) of the Comm'n's Rules, 12 F.C.C.R. 22938, p 14 (1997). Mountain Solutions, by contrast, had no firm financial commitment as of the September 24th due date. Although Mountain Solutions, like Carolina, sought to allay Commission concerns about financial viability by proffering a firm financing commitment, the salient distinction remains: Carolina had adequate financing to make a timely second down payment on the due date; Mountain Solutions did not. The Bureau repeatedly relied in its February 4th orders granting partial waivers to other bidders on the Commission's position that
 
 
 15
 the integrity and functioning of the auction process is dependent on having payment obligations on winning bids promptly met. Timeliness of such payments is a necessary indication to the Commission that the winning bidder is financially able to meet its obligations on the license and intends to use the license for the provision of services to the public. In the Second Report and Order in the competitive bidding docket, the Commission noted that this requirement would also deter defaults by discouraging insincere or financially unqualified bidders from 'shopping' a winning bid in order to obtain financing for a down payment.
 
 
 16
 Southern Communications Systems, Inc, 12 F.C.C.R. 1532 p 6. Other bidders receiving waivers demonstrated their financial qualifications both by the circumstances surrounding the failure to meet that payment deadline and by tendering payment immediately upon being notified of their delinquency or mistake. See, e.g., Long street Communications, 12 F.C.C.R. 1549, p 7; Roberts-Roberts, 12 F.C.C.R. 1825, p 7.By contrast, the Commission noted, "Mountain Solutions has failed to demonstrate its financial viability at the time its second down payment was due." Commission Order, 13 F.C.C.R. 21983, p 16.
 
 
 17
 For these reasons, the rationale articulated by the Commission is not so insubstantial as to render its denial of Mountain Solutions' waiver request an abuse of discretion. See, e.g., BellSouth, 162 F.3d at 1222. Given the salient distinction relied on by the Commission and supported by the record between the circumstances surrounding Mountain Solutions' failure to meet its second down payment obligation and those surrounding the failure of other bidders granted partial waivers, this is not a case in which the Commission has failed to explain its different treatment of similarly situated parties. See Melody Music v. F.C.C., 345 F.2d 730, 732 (D.C. Cir. 1965). Having established a more lenient payment structure for designated entities, which by definition usually faced problems of accessing financial resources, the Commission could reasonably focus on the importance of meeting payment deadlines to deter such entities from abusing the lenient structure by " 'shop[ping]' a winning bid in order to obtain financing for a payment." Commission Order, 13 F.C.C.R. 21983, p 17. The Commission also could reasonably rely on strict enforcement of the deadlines to provide an "early warning" that a winning bidder unable to comply with the payment deadlines may be financially unable to meet its obligation to provide service to the public. See id.
 
 
 18
 Mountain Solutions' reliance upon the Commission's decision to allow NextWave to use proceeds acquired in violation of statutory foreign ownership limitations to meet its second down payment is somewhat misplaced. The Commission granted NextWave's application conditioned on implementation of a restructuring plan that would bring NextWave into compliance with the Commission's foreign ownership rules.In granting an extension of time, the Commission took into consideration the fact that external events might well cause it to revise its ownership rules. While Mountain Solutions and NextWave were both seeking an exception from Commission rules, granting a waiver by allowing a timely down payment in violation of foreign ownership restrictions entails a different set of considerations than those involved in the decision to waive a payment deadline while a bidder secures financing. Thus, NextWave does not appear any more similarly situated to Mountain Solutions than do those licensees who were granted second down payment deadline waivers in light of the inadvertence of their mistakes.
 
 
 19
 More problematic is Mountain Solutions' contention that the Commission's restructuring proceeding, while Mountain Solutions' waiver request was pending, was a de facto waiver of its C block obligations, effectively designed to assure that no C block bidder would find itself in Mountain Solutions' situation. The Commission received numerous requests for some form of debt relief.[10] As part of the restructuring proceeding, the Commission afforded licensees three alternatives to continuing to make payments for the licenses. The alternatives were designed to "provide limited relief for C block licensees having difficulty meeting their financial obligations to the Commission...."[11] Thus, Mountain Solutions asserts, all C block bidders were given an amnesty option, under which they could return their C block licenses and face no additional monetary penalties from the Commission, or at most a 10% penalty, while Mountain Solutions was offered no similar relief. Although, as Mountain Solutions concedes in its brief, not all of the entities that took advantage of the relief offered under the restructuring had filed waiver requests, Mountain Solutions notes that all other licensees that had missed their second payment deadlines and received waivers were allowed to make elections. Consequently, Mountain Solutions contends that the Commission abused its discretion by offering C block licensees amnesty, with a relatively modest penalty, while refusing to allow Mountain Solutions additional time to submit its second down payment, leaving it potentially liable for substantial default penalties.
 
 
 20
 There remains, nonetheless, the salient distinction that only Mountain Solutions, unlike the licensees granted restructuring relief, was in default for missing its second down payment at the time of the restructuring. As the Commission noted in its Order denying Mountain Solutions' application for review, the entities offered restructuring relief "had met their second down payment obligations, bec[o]me licensees, and signed note and security agreements with the Commission." Commission Order, 13 F.C.C.R. 21983, p 23.
 
 
 21
 Furthermore, contrary to Mountain Solutions' contention, the Commission did not improperly articulate a new rule in distinguishing between Mountain Solutions and the entities granted partial waivers. Mountain Solutions maintains that the "determinative factor" in granting waivers was the late tendering of payment, and that Mountain Solutions was disadvantaged because it was unaware of this "rule". As noted, however, in granting waivers the Bureau relied primarily on the inadvertent nature of the mistakes causing the missed deadline; the late tendering of payment was an additional but not a determinative factor in demonstrating the financial viability of the bidders. See, e.g., Longstreet Communications, 12 F.C.C.R. 1549, p 7; Roberts-Roberts, 12 F.C.C.R. 1825, p 7. To the extent that Mountain Solutions contends that the Bureau was obliged to provide notice before giving weight, in considering a waiver petition, to a bidder's access to funds as of the second down payment date, the contention is unpersuasive. The Commission has long noted the importance it attaches to timely payment.[12]
 
 
 22
 Mountain Solutions' contention that the Commission abused its discretion by not giving Mountain Solutions the benefit of two rule changes made subsequent to the filing of Mountain Solutions' waiver petition is also unpersuasive. In February 1997, the Commission extended the deadline for second down payments from five to ten business days following license approval. See 47 C.F.R. §§ 24.711(a)(1)(2) (1998), 1.2107(b), 1.2109(a). In December 1997, after having denied Mountain Solutions' waiver request in September, the Commission adopted a rule allowing an additional ten-business-day grace period for second down payments, albeit with a 5% penalty.47 C.F.R. §§ 24.711(a)(1)(2) (1998), 1.2107(b), 1.2109(a). In explaining these changes, the Commission "recognize[d] that applicants may encounter certain difficulties when trying to arrange financing and make substantial payments under strict deadlines." In the Matter of Amendment of Part I of the Comm'n's Rules, 12 F.C.C.R. 5686, p 61 (1997). Because rulemakings are generally prospective, MCI v. F.C.C., 10 F.3d 842, 846 (D.C. Cir. 1993); see also, e.g., AT & T v. F.C.C., 978 F.2d 727, 732 (D.C. Cir. 1993); Gersman v. Group Health Ass'n., Inc., 975 F.2d 886, 897-98 (D.C. Cir. 1992), there would appear to be no basis for the court to fault the Commission for failing to give Mountain Solutions the benefit of its new rule. Furthermore, had the Commission applied its more lenient payment rule retroactively, Mountain Solutions still would not have gained the thirty days that it requested in its emergency petition for a waiver. Even assuming that Mountain Solutions may have come within the new twenty-business-day grace period as a consequence of its October 17, 1997, supplemental filing, the Commission did not abuse its discretion in refusing to deem as a sufficient basis for waiver Mountain Solutions' inability to secure financing as of the deadline then in effect.
 
 
 23
 Finally, Mountain Solutions contends that application of the second down payment rule to it will not serve the purposes of the rule "to deter default and ensure that winning bidders are sincere and have the financial capability to build out their systems," that the grant of Mountain Solutions' waiver would have been in the public interest, and that the circumstances surrounding Mountain Solutions' waiver, including the treatment accorded purportedly "similarly situated" bidders and the devaluation of the licenses at issue, demonstrate that the Commission's denial of a waiver was arbitrary and capricious. With regard to devaluation, Mountain Solutions maintained in its request for reconsideration that the terms of the reauctioning procedures were likely to result in lower bids, thereby increasing the amount of any default penalty.[13] Mountain Solutions represents in its brief that seven of its licenses were sold in the reauction for between 5% and 9.75% of the net price Mountain Solutions had bid in the initial auction. This means, Mountain Solutions asserts, that it could be subject to nearly $18 million in default penalties. See 47 C.F.R. §§ 24.704(a)(2) and 1.2104(g)(2).
 
 
 24
 Parsing each of Mountain Solutions' contentions for its flaws does not detract from their combined strength, nor from the possibility that the Commission could have viewed Mountain Solutions' waiver request differently than it did. The relief Mountain Solutions sought was not violative of other rules, as, for example, in the case of NextWave. Mountain Solutions in fact secured the financing it needed within the thirty-day period it requested in petitioning for a waiver of the payment deadline, and, following the February 4th orders granting partial waivers, it proffered an irrevocable letter of credit adequate to cover the second down payment, plus a 5% late payment penalty. As in the Carolina case, there was confusion among Mountain Solutions' potential investors about what the anti-collusion guidelines permitted. See supra n.1. Furthermore, Mountain Solutions maintains that its investors were uncertain whether a late-tendered second down payment would be accepted or seized in satisfaction of default penalties. It also was unclear to bidders how they should proceed; Carolina, for example, was told not to submit a late payment but to place funds in an escrow account. Likewise, with respect to financial viability, submission of an irrevocable letter of credit might well afford assurances comparable to escrowed funds.[14]
 
 
 25
 Because Mountain Solutions' bid occurred in the first auction under newly established procedures, there is nothing of record to indicate that bidder or investor confusion constituted either bad faith or the type of misuse of licenses that was of concern to the Commission. Indeed, the Commission eventually recognized in establishing a more extensive grace period that its second down payment rule required more flexibility. Under the new grace periods, Mountain Solutions apparently would have been able to make a timely second payment. Inasmuch as Mountain Solutions was confronted with the type of difficulty in financing that Congress had anticipated and that the Commission acknowledged in establishing special procedures, and because the Commission came to acknowledge that a more flexible payment schedule was necessary and not inconsistent with other policy goals, the Commission would have acted within its discretion to grant Mountain Solutions a partial waiver.
 
 
 26
 To conclude that the Commission abused its discretion in denying Mountain Solutions a waiver, however, would require retroactive application of the Commission's second ten-day grace period, an unusual procedure for rulemaking, see, e.g., MCI v. F.C.C., 10 F.3d at 846, and thus hardly a basis to find an abuse of discretion here. Nothing suggests that the Commission would have been any more receptive to waiver requests based upon inability to secure payment for failure to meet its revised payment deadlines than it was to such requests under its original deadline rules. In amending its payment rule the Commission continued to associate strict enforcement of payment deadlines with preservation of "the integrity of the auction and licensing process by ensuring that applicants have the necessary financial qualifications."Amendment of Part I of the Comm'n's Rules, 12 F.C.C.R. 5686, p 61. As a result, finding an abuse of discretion would not be based on an alteration of the Commission's approach toward payment deadlines, but rather would amount to a requirement that the Commission make retroactive the exact number of grace period days presently allowed.
 
 
 27
 The abuse of discretion standard presents a heavy burden for a petitioner in this court. See, e.g., BellSouth, 162 F.3d at 1222. Recognizing the limits of our proper role, see WOKO, 329 U.S. at 228, the court has defined the outer limits of such discretion but left to the decision-maker the determination of which of the permissible alternative outcomes should apply in a particular case. Cf. Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas, et al. v. Babbitt, 43 F.3d 1491, 1497 (D.C. Cir. 1995). Because the Commission explained its reasoning in denying Mountain Solutions' waiver request, gave fair notice of the importance it attached to meeting payment dates, and acted consistently under the then applicable procedures, we hold that it did not abuse its discretion in denying Mountain Solutions' waiver request.[15]
 
 III.
 
 28
 The default penalty rule provides that "when a winning bidder defaults on a license, the bidder becomes subject to a default payment equal to the difference between the amount bid and the winning bid the next time the license is offered by the Commission, plus a payment equal to three percent of the subsequent winning bid or the amount bid, whichever is lower." Commission Order, 13 F.C.C.R. 21983, p 24 (citing 47 C.F.R. §§ 24.704(a)(2), 1.2104(g)(2)). In denying Mountain Solutions' application for review of the Bureau's denial of its waiver request, the Commission noted first, that it "will assess an initial default deposit of between three percent and twenty percent of the defaulted bid amount where a winning bidder of licensee defaults and the defaulted license has yet to be reauctioned," and second, that, "[i]f additional payment is required, following the reauction of licenses, a second order will assess such payment." Commission Order, 13 F.C.C.R. 21983, p p 24-25. No second order is in the record before the court. While Mountain Solutions did not seek reconsideration of the denial, it did seek reconsideration of the Fourth Report and Order on reauctioning procedures.[16] See supra n. 13.
 
 
 29
 Mountain Solutions contends that it should not be liable for any default penalties based on the price paid for its licenses at reauction. Because, in its view, the Commission has granted a de facto waiver of the default penalty rules as they relate to prices subsequently bid at reauction to every other C block applicant that timely made its first payment, the Commission's restructuring of C block debt and allowing C block licensees to return some or all of their license without default penalties "indicates how inequitable it would be for the [Commission] to strictly enforce its default penalty rules against [Mountain Solutions]." Further, Mountain Solution maintains, the Commission's restructuring of the C block auction process "dictate[d] lower spectral values on any reauction occurring subsequent to those changes," and its promulgation of the default penalty rules never considered that bidders would be subject to spectral devaluation caused by a post-auction restructuring of the process. Without benefit of the Commission's analysis, Mountain Solutions' position that it should not be liable for a default penalty created in part by the Commission's decision to change the rules for reauction after Mountain Solutions had been a successful bidder under a prior regime, has some persuasive force. But therein lies the problem; we have yet to hear from the Commission.
 
 
 30
 Indeed, the Commission responds that Mountain Solutions' request for injunctive relief is not ripe. The Commission explains that:
 
 
 31
 [it] has not issued any order imposing [any portion of the default penalty beyond the initial 3% penalty assessed] on Mountain Solutions. There is no administrative order to which Mountain Solutions must comply, nor does Mountain Solutions face any sanctions for non-compliance.
 
 
 32
 Acknowledging that no order imposing the balance of the default penalties has issued, Mountain Solutions protests that this is purely a ministerial matter given the Commission's statements of intent (in other proceedings), and that the denial of a waiver, combined with the reauction of seven of Mountain Solutions' licenses at specified prices, provides sufficient basis for the court to grant equitable relief.
 
 
 33
 We take the Commission at its word. While the Commission's order denying Mountain Solutions' waiver request implied that Mountain Solutions ultimately could be liable for the difference in amount between its own winning bids and the winning bids upon reauction, Commission Order, 13 F.C.C.R. 21983, p p 24-25, the Commission did not state that this necessarily would be the case. Rather, the Commission required Mountain Solutions to pay a 3% penalty prior to the reauction of its licenses, and stated only that "[i]f additional payment is required, following the reauction of licenses, a second order will assess such payment." Id. at p 25. To date, no such order has issued. Nor has the Commission suggested that it is without authority to waive all or a part of Mountain Solutions' potential default penalties.[17] Consequently, the question of whether equitable relief may be granted is not ripe. See, e.g., Diamond Shamrock Corp. v. Costle, 580 F.2d 670, 673 (D.C. Cir. 1978).
 
 
 34
 Accordingly, we deny the petition insofar as it challenges the denial of the waiver request and we dismiss as unripe that part of the petition seeking injunctive relief.
 
 
 
 Notes:
 
 
 [1]
 Specifically, Mountain Solutions asserted that "Mountain Solutions' investors are bidders in the D, E and F block auction," and that the Commission's anti-collusion guidelines were "confusing and unclear regarding the extent to which bidders in the D, E and F block auction could enter into business-related discussions with C block auction winners."
 
 
 [2]
 See In the Matter of Cenkan Towers, L.L.C. Request for Waiver of Section 90.811 of the Comm'n's Rules, 12 F.C.C.R. 1516, p p 5-8 (1997); In the Matter of CSS Communications Co. Request for a Waiver of Section 90.811 of the Comm'n's Rules, 12 F.C.C.R. 1507, p p 5-8 (1997); Elec. SMR Communication Services Request for Waiver of Section 90.811 of the Comm'n's Rules, 12 F.C.C.R. 1520, p p 5-8 (1997); In the Matter of Hickory Telephone Co., Inc. Request for Waiver of Section 90.811 of the Comm'n's Rules, 12 F.C.C.R. 1528, p p 5-8 (1997); In the Matter of Independence Excavating, Inc. Request for Waiver of Section 90.811 of the Comm'n's Rules, 12 F.C.C.R. 1524, p p 5-8 (1997); In the Matter of The Wireless, Inc. Request for Waiver of Section 90.811 of the Comm'n's Rules, 12 F.C.C.R. 1821, p p 5-8 (1997).
 
 
 [3]
 See In the Matter of Roberts-Roberts & Associates, LLC Request for Waiver of Section 24.711(a)(2) of the Comm'n's Rules, 12 F.C.C.R. 1825, p p 2, 5-8 (1997); In the Matter of RFW, Inc. Request for Waiver of Section 24.711(a)(2) of the Comm'n's Rules, 12 F.C.C.R. 1536, p p 2, 5-8 (1997).
 
 
 [4]
 See In the Matter of Longstreet Communications Int'l., Inc. Request for Waiver of Section 24.711(a)(2) of the Comm'n's Rules, 12 F.C.C.R. 1549, p p 2, 5-8 (1997); In the Matter of Southern Communications Systems, Inc. Request for Waiver of Section 24.711(a)(2) of the Comm'n's Rules, 12 F.C.C.R. 1532, p p 2, 5-8 (1997); In the Matter of Wireless Telecommunications Company Request for Waiver of Section 24.711(a)(2) of the Comm'n's Rules, 12 F.C.C.R. 1544, p p 2, 5-8 (1997); In the Matter of AMK International Inc. and Mobilecall, Inc. Requests for Waiver of Section 90.811 of the Comm'n's Rules, 12 F.C.C.R. 1511, p p 5-8 (1997).
 
 
 [5]
 In the Matter of MFRI, Inc. Request for Waiver of Section 24.711(a)(2) of the Comm'n's Rules, 12 F.C.C.R. 1540, p p 2, 5-8 (1997); In the Matter of Paradise Cable, Inc. Request for Waiver of Section 21.955(B) of the Comm'n's Rules, 12 F.C.C.R. 9760, p p 6-8 (1997).
 
 
 [6]
 See, e.g., Longstreet Communications, 12 F.C.C.R. 1549, p 6 (quoting Implementation of Section 309(j) of the Communications Act--Competitive Bidding, PP Docket No. 93-253, Second Report and Order, 9 F.C.C.R. 2348, 2382 (1994)); Roberts-Roberts, 12 F.C.C.R. 1825, p 6 (same).
 
 
 [7]
 See, e.g., Longstreet Communications, 12 F.C.C.R. 1549, p 7;Roberts-Roberts, 12 F.C.C.R. 1825, p 7.
 
 
 [8]
 Section 24.819 since has been replaced by 47 C.F.R. 1.925 (1999).
 
 
 [9]
 Carolina petitioned for a waiver rather than making a late payment due to "investor uncertainty about the terms under which a payment might be accepted." Id. p 15.
 
 
 [10]
 See In the Matter of Amendment of the Comm'n's Rules Regarding Installment Payment Fin. For Personal Communications Services (PCS) Licensees, Second Report and Order and Further Notice of Proposed Rulemaking, 12 F.C.C.R. 16436, p p 11, 14-15 (1997) ("Restructuring Order"). Some C block auction winners had been able to make timely first and second down payments, or had successfully obtained waivers in that regard, but faced financial difficulties in complying with the terms of the ten-year schedule for paying the balance due. Id.
 
 
 [11]
 Restructuring Order, 12 F.C.C.R. 16436, p 6. The three alternatives were: (1) Disaggregation: returning 15 MHz of PCS spectrum to the Commission with a corresponding 50% reduction in outstanding debt; (2) Amnesty: returning PCS licenses to the Commission with forgiveness of all outstanding C Block debt; and (3) Prepayment: applying 70% of the down payment amount from surrendered licenses toward prepayment of any remaining licenses, as well as the ability to use any additional financing to prepay any licenses. Id.
 
 
 [12]
 As early as its Second Report and Order, In the Matter of Implementation of Section 309(j) of the Communications Act, Second Report & Order, 9 F.C.C.R. 2348 (1994) ("Second Report and Order"), the Commission explained that a timely down payment requirement would deter defaults "by discouraging insincere or financially unqualified bidders from 'shopping' a winning bid in order to obtain financing for a down payment." Longstreet Communications, 12 F.C.C.R. 1549, p 6 (citing Second Report and Order, 9 F.C.C.R. at 2382). Contrary to Mountain Solutions' contention, such concerns were not limited to the timely submission by bidders of a first down payment; the Second Report and Order noted generally that "strong incentives," such as deadlines and penalties for down payments, "must be in place to deter frivolous bids or unqualified bidders...." 9 F.C.C.R. 2348, p 197. In any event, even if the Commission had not previously articulated the policy rationale that formed the primary basis for granting or denying the waiver requests, the Commission's exercise of its wide discretion in denying Mountain Solutions' waiver request on this rationale, which was clearly and evenhandedly articulated in the February 4th orders granting partial waivers and in the denial of Mountain Solutions' request, was in the nature of an adjudicatory decision rather than the announcement of a new rule. See, e.g., F.C.C. v. WOKO, Inc., 329 U.S. 223, 227-228 (1946); City of Chicago v. Fed. Power Comm'n, 385 F.2d 629. 647-638 (D.C. Cir. 1967);Leedom v. Int'l Brotherhood of Elec. Workers, Local Union No. 108, 278 F.2d 237, 241-244 (D.C. Cir. 1960).
 
 
 [13]
 See Mountain Solutions' Petition for Reconsideration of the Fourth Report and Order at 2, In the Matter of Amendment of the Comm'n's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses (WT Docket No. 97-82). Mountain Solutions contended that the C block licenses had been "devalued" because (1) the Commission had changed the financing options available to C-block bidders, (2) market conditions had changed, and (3) the reauction did not include licenses held by successful C block bidders in the initial auction that were in bankruptcy proceedings. Id. at 3-6. Mountain Solutions contended that the Commission had contributed to the "devaluation" of the C block licenses by deciding not to offer bidders in the C block reauction the option of paying for their licenses on an installment basis. See In the Matter of Amendment of the Comm'n's Rules Regarding Installment Payment Fin., Fourth Report and Order, 13 F.C.C.R. 15743, p 50 (1998).
 In the Fourth Report and Order, the Commission had recognized that conditioning receipt of a license upon full payment would require that a bidder have greater resources than had been the case in auctions in which installment financing was available. See id. Mountain Solutions contended that an additional impact would be that bids would be lower because bidders could bid a greater amount if payment could be made over time rather than in one lump sum. See Mountain Solutions' Petition for Reconsideration at 3.
 
 
 [14]
 Mountain Solutions indicated that its proffered letter of credit would have been irrevocable for thirty days and could immediately have been drawn upon by Mountain Solutions for payment to the Commission upon the grant of Mountain Solutions' licenses. While the Commission distinguished a letter of credit from the placing of funds into an escrow account on the basis that Mountain Solutions did not actually relinquish control of the funds so that they could have been drawn upon absent action by Mountain Solutions, the letter of credit would nonetheless have demonstrated Mountain Solutions' ability to pay the required funds. See, e.g., U.C.C. 5-103(1)(a) (1999); 50 Am. Jur.2d Letters of Credit 3 (1992); Black's Law Dictionary 813-814 (5th ed. 1979).
 
 
 [15]
 Because we do not find the Commission's denial of its waiver request arbitrary and capricious, we need not address the question of remedy. Thus, we do not reach Mountain Solutions' contention that rescission of its bids from the original auction and return of any monies paid for the licenses on which it bid is appropriate in view of the devaluation of bids for its licenses and the fundamental restructuring relief afforded to others. Furthermore, if remedy were at issue, we would not address Mountain Solutions' request for rescission because this relief was not sought from the Commission; nor was the argument presented to the Commission in relation to the order under review. United Transp. Bd. v. Surface Transp. Bd., 114 F.3d 1242, 1244 (D.C. Cir. 1997); 47 U.S.C. 405(a).
 
 
 [16]
 On November 12, 1998, the Bureau announced its intent to include Mountain Solutions' licenses in a reauction on March 23, 1999. Mountain Solutions states in its brief on appeal that it filed an application for review, which was pending at time of briefing in the court. Mountain Solutions also filed petitions with the Commission and in this court seeking a stay of the reauction. The petition before the Commission remained pending as of briefing, and the court denied the request. See Mountain Solutions v. FCC, 1999 WL 229027 (D.C. Cir. Mar. 22, 1999).
 
 
 [17]
 See 47 CFR 1.2104(g)(2); 24.704(a)(2).