OMNIPOINT CORPORATION,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

No. 99–1316.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 13, 2000.

Decided June 6, 2000.

: ———————

Mark J. O'Conner argued the cause for the petitioner. Mark J. Tauber and Donna N. Lampert were on brief.

Stanley R. Scheiner, Counsel, Federal Communications Commission, argued the cause for the respondents. Christopher J. Wright, General Counsel, Daniel M. Armstrong, Associate General Counsel, James M. Carr, Counsel, Federal Communications Commission, and Joel I. Klein, Assistant Attorney General, and Andrea Limmer, and Catherine G. O'Sullivan, Attorneys, United States Department of Justice, were on brief. John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, entered an appearance.

Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

On September 17, 1996 the Federal Communications Commission (FCC or Commission) granted Omnipoint Corporation (Omnipoint) eighteen broadband personal communications services (PCS) licenses for C Block spectrum which it won at auction. Because Omnipoint was a qualifying "small business" the FCC financed ninety per cent of Omnipoint's auction bid at a 7% interest rate "based on the rate for ten-year U.S. Treasury obligations applicable on the date the license is granted." 47 C.F.R. § 24.711(b)(3). Omnipoint requested a waiver of the 7% interest rate calculated under section 24.711(b)(3), arguing that it contravened the FCC's policy of setting interest rates "no higher than the government's cost of money," which was then 6.5%. *In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, Second Report and Order, 9 F.C.C.R. 2348, 2390 (1994). The FCC's Bureau of Wireless Communications (Bureau) first denied Omnipoint's waiver request, a decision the Commission ultimately affirmed, finding that strict adherence to section 24.711(b)(3) did not frustrate its underlying policy or unduly burden Omnipoint contrary to the public interest. We deny Omnipoint's petition for review of the FCC's waiver denial.

## I.

In 1993 the United States Congress authorized the FCC to allocate spectrum by auction and directed it to promulgate rules "to ensure that small businesses ... are given the opportunity to participate in the provision of spectrum-based services." 47 U.S.C. § 309(j)(4)(D). In setting up the small business preference, the FCC identified "two broad, basic ... policy goals: promoting economic growth and enhancing access to telecommunications service offerings for consumers, producers, and new entrants." Second Report and Order, 9 F.C.C.R. at 2349. The FCC intended its rules to foster economic growth by ensuring "that small businesses ... are given the opportunity to participate in both the competitive bidding process and the provision of spectrum-based services." *Id.* at 2388. It promulgated section 24.711(b)(3), establishing the interest rate for small business auction winners "based on the rate of the U.S. Treasury obligations (with maturities closest to the duration of the license term) at the time of licensing." *Id.*

at 2410 (codified at 47 C.F.R. § 24.711(b)(3)). In promulgating section 24.711(b)(3) the FCC stated:

> Finally, we also agree with those commenters that suggest that interest on installments should be charged at a rate no higher than the government's cost of money. We recognize that, in addition to providing a source of financing that might not otherwise be available to small entities, we should impose interest in a manner that is designed to provide significant financial assistance to small businesses. Accordingly, in order to ensure that this government financing results in significant capital cost savings to small businesses, we will impose interest on installment payments equal to the rate for U.S. Treasury obligations of maturity equal to the license term. This rate is generally lower than the prime lending rate established by private banks.

*Id.* at 2390–91.[1] The FCC consistently applied the Treasury note rate in assigning installment payment interest rates. *See In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding,* Fifth Report and Order, 9 F.C.C.R. 5532, 5592–93 (1994) ("Interest will accrue at the Treasury note rate."); *In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding,* Sixth Report and Order, 11 F.C.C.R. 136, 156–59 (1995), *aff'd, Omnipoint Corp. v. FCC,* 78 F.3d 620 (D.C.Cir. 1996) (Interest will be charged "at a rate equal to ten-year U.S. Treasury obligations applicable on the date the license is granted.").

On September 17, 1996, after auction, the FCC granted Omnipoint eighteen broadband PCS licenses for C Block spectrum. As a qualifying small business Omnipoint was eligible for government-sponsored financing of ninety per cent of its winning bid obligation and a favorable interest rate on its debt. *See* Second Report and Order, 9 F.C.C.R. at 2389–90; 47 C.F.R. § 24.711(b). At the time the "rate for ten-year U.S. Treasury obligations" was 7%, set by the August 1996 United States Treasury auction. As both sides agree, however, the August 1996 Treasury auction was "unusual." *IN RE REQUESTS FOR WAIVER OF SECTION 24.711(B)(3) OF THE COMM'N'S RULES ESTABLISHING THE INTEREST RATE ON INSTALLMENT PAYMENTS FOR C BLOCK PCS LICENSEES,* Memorandum Opinion and Order, 14 F.C.C.R. 9298, 9302 (1999).

Treasury auctions for ten-year notes are typically held in February, May, August and November of each year using a competitive bidding methodology.[2] In 1996, however, for the first time since 1980, the Treasury Department auctioned ten-year notes in July and then reopened the July auction in August. As a result, the August notes bore the coupon rate of 7% from the July auction even though the rate in fact reflected neither the August auction results, nor August market conditions nor

---

1. In 1995 the FCC amended section 24.711(b)(3) to provide for an interest rate "based on the rate for ten-year U.S. Treasury obligations applicable on the date the license is granted." *See* Race and Gender Based Provisions for Auctioning C Block Broadband Personal Communications Services Licenses, 60 Fed.Reg. 37,786, 37,796 (1995) (codified at 47 C.F.R. § 24.711(b)(3)). The amended version applies to Omnipoint. After a 1998 amendment not relevant here, section 24.711(b)(3) now provides for an interest rate based on the ten-year Treasury note "plus 2.5 percent." Competitive Bidding Process, 63 Fed.Reg. 2315, 2349 (1998) (codified at 47 C.F.R. § 24.711(b)(3)).

2. The Treasury auctions ten-year notes by accepting investors' written bids specifying the lowest asking yield and moving upward until it raises a targeted amount of money. Each auction establishes a yield and a coupon rate. Treasury regulations define "yield" as the "annualized rate of return to maturity on a note or bond expressed as a percentage." 31 C.F.R. § 356.2. The coupon rate, which a ten-year note bears, is "set at a ⅛ of one percent increment" which is "closest to, but not above, par when evaluated at the weighted-average yield of awards to successful competitive bidders." *Id.* § 356.20(b).

the government's actual cost of money—a yield of 6.535%. Instead, the bidders in the August auction paid a premium for the ten-year notes. According to Omnipoint, had the Treasury Department instead issued a new security in August, "the average auction yield of 6.535% would have dictated a coupon rate of 6.5% on the new security." John Friel Decl. 2 (Dec. 11, 1996). On December 16, 1996 Omnipoint filed a request for waiver of section 24.711(b)(3), claiming that, because of the August auction's "unusual circumstances," the FCC's use of the 7% coupon rate contravened both its policy of setting interest rates at no more than the government's cost of money and the public interest. Omnipoint requested that the FCC instead apply a 6.5% interest rate based on the August auction's weighted yield. The Bureau denied Omnipoint's waiver request and the FCC, on June 2, 1999, affirmed the Bureau's denial. Omnipoint then timely petitioned for review.

## II.

■ The FCC interpreted "rate" as used in section 24.711(b)(3) as the coupon rate and therefore applied the August auction's 7% coupon rate for ten-year notes to Omnipoint's installment payments.[3] *See* Memorandum Opinion and Order, 14 F.C.C.R. at 9303. Omnipoint contends that the FCC arbitrarily and capriciously denied its waiver request, ignoring the required "hard look" standard. *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1224–25 (D.C.Cir.1999) (Waiver requests "are not subject to perfunctory treatment, but must be given a hard look.") (quotation omitted). According to the FCC waiver rule:

The Commission may grant a request for waiver if it is shown that:

(i) The underlying purpose of the rule(s) would not be served or would be

frustrated by application to the instant case and that a grant of the requested waiver would be in the public interest; or

(ii) In view of the unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative.

47 C.F.R. § 1.925(b)(3). Omnipoint assumes a "heavy" burden because "an agency's refusal to grant a waiver will not be overturned unless the agency's reasons are so insubstantial as to render that denial an abuse of discretion." *Mountain Solutions, Ltd., Inc. v. FCC*, 197 F.3d 512, 517 (D.C.Cir.1999) (quotations omitted). Furthermore, "the agency's strict construction of a general rule in the face of waiver requests is insufficient evidence of an abuse of discretion." *Id.* (citing *BellSouth*, 162 F.3d at 1225).

■ Omnipoint argues that section 24.711(b)(3)'s underlying purpose is to provide financing to C Block licensees at a rate "no higher than the government's cost of money." The record, however, does not support Omnipoint's "restricted view of the Commission's goals and purposes." *BellSouth*, 162 F.3d at 1224. The FCC initially articulated its purpose as "promoting economic growth and enhancing access to telecommunications service offerings for consumers, producers, and new entrants." Second Report and Order, 9 F.C.C.R. at 2348. To that end the FCC allowed a small business licensee to pay for its licenses in installment payments over the license term. *See* 47 C.F.R. § 24.711(b). The FCC also "agree[d] with those commenters that suggest[ed] that interest on installments should be charged at a rate no higher than the government's cost of money."

---

3. Omnipoint contends that the FCC arbitrarily interpreted "rate" as the coupon rate instead of the yield. Such an argument, however, is beyond the scope of a waiver request. *See WAIT Radio v. FCC*, 418 F.2d 1153, 1158

(D.C.Cir.1969) ("The very essence of waiver is the assumed validity of the general rule, and also the applicant's violation unless waiver is granted.").

**724**

Second Report and Order, 9 F.C.C.R. at 2390. But the FCC stopped short of committing itself and ultimately retreated from the notion that its purpose was to provide an interest rate no higher than the government's cost of money. Instead, the FCC considered section 24.711(b)(3) to represent "an identifiable benchmark" for interest rates. Memorandum Order and Opinion, 14 F.C.C.R. at 9303 ("The Commission has recognized that Treasury auctions provide an identifiable benchmark on which to base interest rates for installment payments, but may not always reflect the government's cost of money.") (citing *AMENDMENT OF PART 1 OF THE COMM'N'S RULES—COMPETITIVE BIDDING PROCEEDING,* Order, Memorandum Opinion and Order and Notice of Proposed Rulemaking, 12 F.C.C.R. 5686, 5709 (1997)). The FCC clarified that "[t]he policy behind our installment payment plan was to facilitate small business participation in our auction process by, among other things, application of the low interest rates used in the Treasury auctions." *Id.; see also* Second Report and Order, 9 F.C.C.R. at 2390–91 (FCC intended to provide financing "in a manner that is designed to provide significant financial assistance" at rates "generally lower than the prime lending rate established by private banks."). The 7% interest rate, while higher than the government's cost of money in August 1996, was nevertheless significantly lower than the 11.625% interest rate private banks were then charging. *See* Memorandum Opinion and Order, 14 F.C.C.R. at 9303 n. 39. We conclude that the FCC reasonably determined that strict adherence to section 24.711(b)(3) did not frustrate its underlying purpose to provide interest rates lower than those of private banks.

Additionally, Omnipoint failed to show that its "unusual factual circumstances" made the application of section 24.711(b)(3) to its installment payments inequitable or contrary to the public interest. Although the August 1996 Treasury auc-

tion was unusual, Omnipoint claims that its additional $6 million dollar cost (over ten years) resulting from the 0.5% interest rate difference harms the public interest. Omnipoint cannot satisfy the public interest requirement, however, merely by "equat[ing] its own business interest with the public interest." *BellSouth,* 162 F.3d at 1225. We conclude that the FCC did not abuse its discretion in denying Omnipoint's request for a waiver from section 24.711(b)(3) in that it reasonably determined that "the Bureau gave [Omnipoint's] waiver request a 'hard look'" and that Omnipoint did not show how a waiver would serve the public interest. *Id.* Accordingly, Omnipoint's petition for review of the FCC's waiver denial is

*Denied.*