# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 6, 2012

Lyle W. Cayce
Clerk

No. 12-60070

JOSEPH M. HILL, Trustee in Bankruptcy for Lakehills Consulting, L.P.,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

Respondents.

Petition for Review of an Order of the
Federal Communications Commission

Before STEWART, Chief Judge, GARZA, and ELROD, Circuit Judges.

PER CURIAM:[*]

Joseph M. Hill, Trustee in Bankruptcy for Lakehills Consulting, L.P. ("Lakehills"), seeks review of the Federal Communications Commission ("FCC") Order issued in response to Lakehills' appeal of the decision by the Universal Service Administrative Company ("USAC") to rescind funding for projects performed by Lakehills for the Houston Independent School District ("HISD"). We reject the arguments advanced by Lakehills, and therefore, deny the petition for review.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-60070

## I.

## A.

As part of the Telecommunications Act of 1996 ("the Act"), Congress amended the Communications Act of 1934 by adding Section 254. *See* Pub. L. No. 104-104, § 254, 110 Stat. 56, 71 (1996) (codified at 47 U.S.C. § 254). Section 254 expanded the scope of "universal service"[1] by, in part, creating a program to ensure that elementary schools, secondary schools, and libraries would have affordable access to modern communication services. *See* 47 U.S.C. § 254(h); H.R. Rep. No. 104-458, at 17 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 124, 133. The statutory language of Section 254 contains a congressional directive for the FCC to "establish competitively neutral rules . . . to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms . . . ." § 254(h)(2)(A). Pursuant to this directive, the FCC established the E-rate program which provides eligible schools and libraries with discounts[2] on eligible telecommunications equipment and services. 47 C.F.R. §§ 54.500–.523. The FCC appointed USAC, a not-for-profit corporation, to administer the federal universal service support mechanisms, including the E-rate program. *See generally* §§ 54.701–.702.

The FCC, at the inception of the E-rate program, adopted competitive bidding rules to ensure eligible schools and libraries would be informed of all available choices for services and prices would remain as low as possible,

---

[1] The longstanding goal of federal telecommunications law that reasonably priced telecommunications services should be available in all parts of the nation is referred to as "universal service." *See* 47 U.S.C. § 151.

[2] Under the E-rate program, schools and libraries are eligible for funding support—ranging from 20% to 90% depending on the school district's student poverty level—on the cost of eligible telecommunications equipment and services. 47 C.F.R. § 54.505.

allowing for greater participation rates among eligible schools and libraries, given the limited availability of funds. 12 FCC Rcd. 8776 ¶ 480 (1997). These competitive bidding rules mandate that applicants for discounted services comply with a series of procedural requirements in order to be eligible for funding. *See* 47 C.F.R. §§ 54.504, 54.511 (2001).

In 1999, the FCC issued two companion orders addressing the recovery of funds disbursed pursuant to the E-rate program. *See* 15 FCC Rcd. 7197 (1999) (hereinafter Waiver Order); 17 Comm. Reg. (P&F) 1192 (1999) (hereinafter Adjustment Order). In the Adjustment Order, the FCC, relying on *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990),[3] explained that funds disbursed in violation of the Act were required to be recovered by USAC. *See* Adjustment Order, at ¶ 7. In the Waiver Order, the FCC granted a limited waiver of several FCC rules, including violations of the competitive bidding rules, for the first funding year of the E-rate program. 15 FCC Rcd. 7197 ¶ 1. The FCC emphasized the distinction between violations of the Act, which the FCC lacked discretion to waive, and violations of FCC rules, which the FCC retained discretion to waive for good cause. *Id.* at ¶ 6, ¶ 11 n.2. Although it agreed that limited waivers were appropriate in the first year of the program, the FCC explained that "each applicant and service provider in [future] funding years . . . is on notice that funding commitments and disbursements, if in violation of federal statutes, [FCC] regulations, or USAC procedures, will be subject to adjustment." *Id.* at ¶ 8.

In 2004, the FCC issued an order "set[ting] forth a framework regarding what amounts should be recovered by [USAC] and the [FCC] when funds have been disbursed in violation of specific statutory provisions and [FCC] rules."

---

[3] In *Richmond*, the Supreme Court explained that under the Appropriations Clause of the United States Constitution, "[m]oney may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by statute." 496 U.S. at 424.

19 FCC Rcd. 15808 ¶ 1 (2004) (hereinafter Fifth Report and Order).[4] The FCC set forth the general principle that "[a]mounts disbursed in violation of the statute or a rule that implements the statute or a substantive program goal must be recovered in full." *Id.* at ¶ 20. The FCC, however, explained that full recovery "may not be appropriate for violation of all [FCC] rules regardless of the reason for their codification."[5] *Id.* at ¶ 19. Accordingly, the FCC provided examples of violations that would result in full recovery. *Id.* at ¶ 20. Specifically, the FCC concluded that it "should recover the full amount disbursed for any funding requests in which the beneficiary failed to comply with the [FCC]'s competitive bidding requirements . . . ." *Id.* at ¶ 21. The FCC explained that this conclusion "is based on our position that the competitive bidding process is a key component of the [E-rate] program, ensuring that funds support services that satisfy the precise needs of an applicant and that services are provided at the lowest possible rates." *Id.*

## B.

Lakehills' petition for review involves contracts for eligible services that HISD awarded Lakehills pursuant to the E-rate program in funding years 2002, 2003, and 2004. In each funding year, HISD awarded contracts to co-signors Analytical Computer Services ("ACS")[6] and Micro Systems Engineering ("MSE"). ACS and MSE completed various projects pursuant to these contracts and received payments from USAC and HISD for services performed. In January 2007, a newspaper article was published raising concerns about

---

[4] The FCC explained that this framework was an affirmation and clarification of the companion orders issued in 1999. *Id.* at ¶¶ 15–17.

[5] The FCC emphasized, however, that it was without authority to waive statutory violations. ¶ 29.

[6] In early 2004, ACS was acquired by Southwest Analytical Computer Services ("SWACS"). For the sake of clarity, because this acquisition is not relevant to the disposition of this case, we will continue to refer to ACS even when discussing events that postdated SWACS's acquisition of ACS.

HISD's selection of ACS for contracts under the E-rate program. Specifically, the article reported that ACS's co-signor, MSE, was the subject of a federal investigation into corruption and fraud arising out of MSE's selection as a service provider for the Dallas Independent School District. The article also reported that Hewlett Packard ("HP") severed its relationship with ACS and MSE based on alleged violations of HP's ethics rules by MSE.

A few days after the article was published, Lakehills acquired all of the limited and general partnership interests in ACS. Following Lakehills' acquisition of ACS, HISD agreed to assign its E-rate program contracts with ACS to Lakehills. Lakehills then requested that USAC consolidate all of ACS's Service Provider Identification Numbers ("SPINs")[7] into Lakehills' SPIN. USAC agreed to this request in March 2007. A few weeks later, USAC sent a letter to Frank Trifilio ("Trifilio"), the former owner and president of ACS, and a minority owner of Lakehills, inquiring about ACS's: (1) business ties to MSE; (2) involvement in HISD's competitive bidding process; and (3) alleged violations of HP's ethics rules. Trifilio responded to USAC in a letter denying any wrongdoing and explaining that HP did not provide a specific reason for severing ties with ACS.

No action was immediately taken by USAC following the receipt of Trifilio's response. Around this time, Lakehills sent invoices to USAC for work performed pursuant to the contracts with HISD for the 2002, 2003, and 2004 funding years. Payments pursuant to these invoices were delayed and Lakehills, after inquiring as to the source of the delay, was allegedly informed by USAC that internal administrative issues were causing the delays. During the summer of 2007, HISD requested that Lakehills complete a switch project by the beginning of the 2007-2008 school year. Lakehills accommodated this

---

[7] Once a service provider has been selected to complete an approved project, it is issued a SPIN by USAC which allows the service provider to receive payment following the completion of the E-rate project.

request and was able to complete the $17 million switch project between May and September 2007.

On September 27, 2007, USAC informed Lakehills that it would hold E-rate program payments to Lakehills because of ACS's business ties with MSE. In this letter, USAC requested information from Lakehills regarding MSE's involvement with ACS's contracts and Lakehills' employment of former ACS employees. Lakehills responded shortly thereafter confirming that all ACS employees became employees of Lakehills and that HISD required MSE to be part of ACS's contracts. In November 2007, USAC issued a letter informing Lakehills that it would continue to hold payments to Lakehills because of the ties between ACS, Lakehills, and MSE.

In June 2009, Lakehills filed a petition for liquidation under Chapter 7 of the Bankruptcy Code, claiming the withheld E-Rate program funds as assets.[8] The United States government filed a proof of claim for $225,182,370, which represents the sum of E-rate program funding paid to ACS for the 2002, 2003, and 2004 funding years, trebled pursuant to the False Claims Act. Lakehills filed an objection to this claim and litigation relating to this objection has been stayed pending resolution of this petition for review.

In March 2011, USAC rescinded E-rate program funding committed to HISD for funding years 2002, 2003, and 2004.[9] USAC's decision was based on its findings that there were extensive violations of the competitive bidding rules during the relevant funding years. For instance, in funding year 2002, USAC found that HISD selected ACS and MSE prior to concluding its competitive

---

[8] Lakehills claims that USAC's failure to make payments for E-rate program contracts was the primary cause for its filing.

[9] HISD, which was being investigated for violations of the competitive bidding rules, entered into a settlement agreement with the United States government in 2010, agreeing to pay $850,000 to the United States and relinquish all rights to funding requests for funding years 2002, 2003, and 2004.

bidding process, failed to obtain signed contracts prior to submitting its forms to USAC, and accepted numerous impermissible gifts from ACS and MSE. For funding years 2003 and 2004, USAC similarly found that HISD awarded the contracts to ACS and MSE prior to completion of its competitive bidding process and that significant impermissible gifts were provided to HISD by ACS and MSE. USAC concluded, that for each funding year in question, it was required to rescind the funding commitments and recover any improperly disbursed funds.

In May 2011, Lakehills filed an administrative appeal with the FCC. In November 2011, the FCC released its Order affirming USAC's decision to rescind the funding commitments made to HISD during the relevant funding years. *See* 26 FCC Rcd. 16586 (2011) (hereinafter Order). In its Order, the FCC concluded that ACS violated the competitive bidding rules for each of the funding years in question. *Id.* at ¶¶ 20–21. The FCC rejected Lakehills' argument that the FCC could not recover funds disbursed in violation of FCC rules, explaining that the competitive bidding rules are substantive agency regulations that have the force and effect of law and must be adhered to. *Id.* at ¶¶ 22–24. The FCC also rejected Lakehills' argument that the value of services Lakehills provided to HISD should offset any recovery of funds disbursed. *Id.* at ¶¶ 25–28. The FCC determined that because the contracts at issue were awarded outside of the required competitive bidding process, HISD and Lakehills were not entitled to any E-rate funding. *Id.* at ¶ 25. The FCC also explained that the government did not receive any cognizable benefit from Lakehills' performance of services under the contract, rather, any benefit was received by HISD. *Id.* at ¶ 26. Finally, the FCC declined Lakehills' request for a waiver, reasoning that the public interest would not be served by waiving its rules where the record contained evidence of waste, fraud, and abuse. *Id.* at ¶¶ 29–30. Lakehills filed a timely petition for review with this court.

No. 12-60070

II.

Lakehills advances two narrow challenges to the FCC's Order in its petition for review. First, Lakehills argues that the FCC's rule—that funds disbursed in violation of the competitive bidding rules should be recovered in full (hereinafter "full recovery rule")—is not in accordance with law. Second, Lakehills argues that even if the full recovery rule is valid, the FCC abused its discretion by denying Lakehills' request for a waiver from the full recovery rule here. We will address each argument in turn.

A.

We first address Lakehills' contention that the FCC's full recovery rule, and the FCC's adherence to the full recovery rule in its Order, is not in accordance with law. Under the Administrative Procedure Act, agency action is reviewed solely to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706. Our review under the "arbitrary and capricious" standard is narrow and we cannot substitute our judgment for that of the agency. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Supreme Court has explained that:

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

Lakehills' briefing in this case has clarified the scope of its first argument. First, Lakehills does not challenge the validity of the competitive bidding rules issued by the FCC. Second, Lakehills does not challenge the FCC's factual findings that its predecessor, ACS, violated the competitive bidding rules in

8

funding years 2002, 2003, and 2004.  Third, Lakehills does not dispute that the FCC has the *ability* to issue rules governing the recovery of E-rate program funding commitments where violations of FCC rules occur.[10]  Lakehills' sole argument is that the FCC's full recovery rule is not in accordance with law because the FCC allegedly failed to engage in sufficient legal analysis for the rule because the FCC afforded the Supreme Court's holding in *Richmond* dispositive weight.[11]

Lakehills' contention that the sole basis for the full recovery rule was an erroneous reliance on *Richmond* is simply incorrect.  In two orders the FCC issued on October 8, 1999, the FCC clearly noted the distinction between funds disbursed in violation of the Act and funds disbursed in violation of FCC rules.  In fact, the FCC waived competitive bidding rule violations for the first year of the E-rate program—clearly acknowledging that recovery of funds disbursed in violation of FCC rules, as opposed to the Act itself, was not *mandatory* under *Richmond*.  *See* Waiver Order ¶ 1.

---

[10] Lakehills, in its reply brief, acknowledges that "violations of regulation[s] sometimes are appropriate legal bars to eligibility for payments of funds under programs created by Congress."  Lakehills argues, however, that the competitive bidding rules are "not such regulations" because the Act does not contain any language conditioning eligibility for receipt of funds on competitive bidding conduct.  This distinction is not persuasive.  In this case, Congress expressly delegated to the FCC the task of "establishing competitively neutral rules . . . to enhance . . . access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms . . . ."  *See* 47 U.S.C. § 254(h)(2).  Pursuant to this directive, the FCC established the E-rate program and adopted the competitive bidding rules as requirements for E-rate funding eligibility.  Lakehills does not challenge the validity of the competitive bidding rules or ACS's violation of those rules.  Accordingly, we do not find error with the FCC's rejection of Lakehills' argument that the FCC is prohibited from recovering funds when violations of the FCC rules, as opposed to violations of the Act, have occurred.  *See* Order, at ¶¶ 22–23.

[11] Lakehills, in its reply brief, explained that "[t]he gravamen of Lakehills' petition . . . is that the FCC never engaged in such an analysis because it misinterpreted [*Richmond*]."  Lakehills further described the FCC's error as stemming from "the erroneous assumption that [*Richmond*] established a legal bar to payment, regardless of the circumstances, [thus] it was unnecessary for the FCC to seriously consider the Telecom [sic] Act and its Universal Service Principles."

In 2004, the FCC once again acknowledged the distinction between amounts disbursed in violation of the Act, which it lacked authority to waive, and amounts disbursed in violation of FCC rules. *See* Fifth Report and Order, ¶ 29. Although the FCC acknowledged its *ability* to waive violations of FCC rules, it nevertheless concluded that it "should recover the full amount disbursed for any funding requests in which the beneficiary failed to comply with the [FCC]'s competitive bidding requirements . . . ." *Id.* at ¶ 21. Contrary to Lakehills' argument that the FCC afforded *Richmond* dispositive weight, the FCC made *no* reference to *Richmond* when reaching this conclusion. Instead, the FCC explained that the full recovery rule was "based on our position that the competitive bidding process is a key component of the [E-rate] program, ensuring that funds support services that satisfy the precise needs of an applicant and that services are provided at the lowest possible rates." *Id.* We conclude that Lakehills' argument that the FCC's full recovery rule is arbitrary and capricious because the FCC afforded *Richmond* dispositive weight fails.

We turn to Lakehills' argument that the FCC's conclusion—that the full recovery rule was appropriate—failed to give sufficient weight to the Act and its universal service principles. We have explained that "a party must afford the [FCC] an opportunity to pass on the arguments the party presents for judicial review." *Comsat Corp. v. FCC*, 250 F.3d 931, 937 (5th Cir. 2001) (citing 47 U.S.C. § 405). Lakehills, although it argued that the FCC adopted the full recovery rule based on a misreading of *Richmond*, did not argue before the FCC that the FCC failed to consider the universal service principles when adopting the full recovery rule. Accordingly, Lakehills' failure to raise this particular argument before the FCC precludes our review.

Even if Lakehills' argument was properly raised, we would be unpersuaded. Section 254(b) provides that the FCC "shall base policies for the preservation and advancement of universal service" on seven enumerated

principles, including: (1) that quality services should be available at just, reasonable, and affordable rates; (2) elementary and secondary schools and classrooms should have access to advanced telecommunications services; and (3) other principles the FCC determines are necessary and appropriate for the protection of the public interest, convenience, and necessity. *See* 47 U.S.C. § 254. Lakehills argues that by adopting the full recovery rule, and applying the rule in this case, the FCC failed to adequately consider these principles. Specifically, Lakehills explains that the FCC should have considered whether quality services were provided and whether the cost charged for the services was too high. Lakehills also hypothesizes that the failure to consider the value of completed services will ultimately decrease the availability of E-rate funding because creditors will "have little incentive to participate in any E-rate program."

Lakehills' arguments fail to demonstrate that the FCC's decision to adopt the full recovery rule or application of the rule in this case were arbitrary and capricious. The FCC has explained that the competitive bidding rules ensure that available funds are used to satisfy the needs of schools at the lowest possible price, and disbursing funds to service providers who violate the competitive bidding rules reduces the amount available for compliant applicants. This rationale directly considers the universal service principles. Moreover, it is likely that a strict rule denying or recovering funding when violations of the competitive bidding rules occur greatly encourages strict compliance with the rules, ultimately leading to increased competition, better quality of services, and lower prices. It is unclear how providing funding to service providers who violate the competitive bidding rules for services completed—even if those services are done well—would advance the overall goal of universal service. Certainly, allowing exceptions would benefit the service provider, and any stakeholder of the service provider such as its

creditors; however the FCC was directed to base its E-rate program policies on the preservation of universal service—not on the interests of service providers.[12] We conclude that the FCC's decisions adopting the full recovery rule and strictly applying the rule in its Order were not arbitrary and capricious.

## B.

Lakehills' second argument is that the FCC's decision denying its request for a waiver of the full recovery rule was an abuse of discretion. Our review of an agency's denial of a waiver is extremely limited and results in reversal only when "the agency's reasons are so insubstantial as to render that denial an abuse of discretion." *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1181–82 (D.C. Cir. 2003) (citation omitted); *see also People of N.Y. v. FCC*, 267 F.3d 91, 107 (2d Cir. 2001) ("Challenging the denial of a waiver is . . . not an easy task because an applicant for waiver bears the heavy burden on appeal to show that the [FCC's] reasons for declining to grant the waiver were so insubstantial as to render that denial an abuse of discretion." (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)). FCC rules provide that it may grant a request for waiver of its rules upon a showing of good cause. *See* 47 C.F.R. § 1.3. "The FCC may exercise its discretion to waive a rule where particular facts would make strict compliance inconsistent with the public interest." *Ne. Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990) (citing *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969)).

Here, the FCC concluded that the reasons Lakehills provided in support of a waiver were inadequate. The FCC noted that it had only waived its competitive bidding rules in circumstances where the applicant had committed

---

[12] Although it is not dispositive to our analysis, we are also unpersuaded by Lakehills' contention that the full recovery rule will lead to a decrease in the availability of credit for service providers. Service providers, as well as entities extending credit to service providers, are aware that payment for E-rate projects will be received if the competitive bidding rules are complied with. It is unclear why a service provider who ensures that it complies with the competitive bidding rules would have any trouble obtaining credit to finance E-rate projects.

a minor error in completing the application, but that it had not found waiver to be appropriate in instances where the competitive bidding process was not fair and open. It relied heavily on its conclusion that the public interest would not be served by waiver of its rules where waste, fraud, and abuse was evident in the record.

The FCC also replied directly to several arguments advanced by Lakehills—arguments Lakehills now argues were "not considered" or "discounted" by the FCC. First, responding to Lakehills' argument that USAC's conduct encouraged Lakehills to undertake the 2007 switch project, the FCC explained that USAC had no obligation to inform Lakehills of the ongoing investigation, and therefore USAC's silence during the investigation did not justify a waiver.[13] Second, the FCC acknowledged the services Lakehills provided to HISD, but concluded that they did not justify a waiver. Specifically, the FCC explained that any value from the 2007 switch project benefitted HISD, not the United States, rejecting Lakehills' argument that intangible benefits, such as a "more technologically savvy and educated citizenry," were sufficient to justify a waiver.[14]

Overall, the FCC's evaluation of Lakehills' request for a waiver was rigid.

---

[13] Lakehills also argued that granting its request for the SPIN consolidation constituted affirmative conduct by USAC that facilitated Lakehills taking on the new work during the summer of 2007. This argument is unconvincing because (1) the SPIN consolidation was merely an accounting procedure taken in response to Lakehills' request, and (2) USAC sent a letter to Trifilio in late March 2007 inquiring into potential improprieties by ACS in relation to the HISD contracts. Lakehills' alleged belief that its contracts with HISD were no longer under suspicion was not encouraged by USAC's conduct. Lakehills should have been aware of the possibility that an investigation was ongoing, and its decision to take on new work with the hope of receiving payment from the E-rate program was a risk. *See BDPCS, Inc.*, 351 F.3d at 1182 (rejecting a request for a waiver where the appellant proceeded despite its knowledge that it was likely to suffer a penalty, but nevertheless, "gambled and lost").

[14] In *United States v. Rogan*, the Seventh Circuit utilized similar reasoning rejecting an argument that the value of service provided should mitigate recovery of funds disbursed, explaining that a doctor "did not furnish any medical service to the United States. The government offers a subsidy . . . with conditions. When the conditions are not satisfied, nothing is due." 517 F.3d 449, 453 (7th Cir. 2008).

Arguably strong justifications, such as the significant value provided to HISD from the completion of the 2007 switch project, were not afforded the weight that Lakehills hoped they might receive. This rigidity, by itself, does not necessarily constitute an abuse of discretion. In *BellSouth*, the court explained that "strict adherence to a general rule may be justified by the gain in certainty and administrative ease, even if it appears to result in some hardship in individual cases. Rigid and consistent adherence to a policy will be upheld if it is valid." *BellSouth*, 162 F.3d at 1225. As discussed *supra*, the FCC's policy of seeking full recovery for violations of the competitive bidding rules is valid because it was based on the FCC's reasonable conclusion that such a rule ensures that E-rate funds support services satisfying the precise needs of the applicant and are provided at the lowest possible costs, increasing participation rates among eligible schools and libraries. Therefore, the FCC's strict adherence to the full recovery rule does not constitute an abuse of discretion, despite the hardship suffered by Lakehills.

Courts have explained, however, that an abuse of discretion may be found when an agency arbitrarily waives a requirement in one case but not in another. *See, e.g.*, *Mountain Solutions, Ltd. v. FCC*, 197 F.3d 512, 517 (D.C. Cir. 1999). In *Mountain Solutions*, the court concluded that the FCC did not abuse its discretion in denying a waiver request where the FCC (1) explained its reasoning in denying the request, (2) acted consistently, and (3) gave fair notice of the importance of the particular rules in question. *Id.* at 522. This case falls directly in line with *Mountain Solutions*. Here, the FCC: (1) explained that the public interest would not be served by waiving its rules when there was evidence of waste, fraud, and abuse; (2) consistently has found that waiver is not appropriate if the competitive bidding process was not fair and open; and (3) as early as 1999, provided fair notice that violations of the competitive bidding rules would potentially result in the recession of funding commitments.

Accordingly, there is no evidence that the FCC has arbitrarily waives its full recovery rule in other cases but declined to do so in its Order denying Lakehills' waiver request.

Undisputedly, Lakehills has suffered hardship from the FCC's strict adherence to its full recovery rule for violations of its competitive bidding rules. We nevertheless conclude that Lakehills has failed to meet its high burden to demonstrate that the FCC's reasons for denying the waiver—primarily that the public interest would not be served where the underlying contracts were obtained in clear violation of the competitive bidding rules—were so insubstantial as to render that denial an abuse of discretion.

## III.

The FCC's decision applying the full recovery rule in its Order was not arbitrary and capricious because the FCC (1) did not afford dispositive weight to *Richmond* and (2) adequately considered the universal service principles. Furthermore, the FCC's reasons for denying Lakehills' waiver request were not so insubstantial that denial was an abuse of discretion. Accordingly, we DENY Lakehills' petition for review.